COMMONWEALTH *vs.* SCOTT B. ROSE
(and eleven companion cases[1]).

No. 97-P-1363.

Bristol. February 9, 1999. - June 24, 1999.

Present: KASS, KAPLAN, & JACOBS, JJ.

*Joint Enterprise. Evidence,* Joint enterprise. *Homicide. Malice. Practice, Criminal,* Instructions to jury. *Intoxication.*

At the trial of two defendants on murder indictments, the evidence of joint venture was sufficient to warrant the judge's denial of one defendant's motions for required findings of not guilty. [173-175]

At the trial of two defendants on indictments for murder in the first degree, no *Bruton* issue (*Bruton* v. *United States,* 391 U.S. 123, 135-136 [1968]) arose with regard to extrajudicial statements made by one defendant to a witness, where other admissible evidence established the existence of a joint venture and where the statements were made in the pendency of the venture and in furtherance of its goal. [175-176]

At the trial of a murder case, the judge's instructions on malice were correct and there was no shifting of the burden of proof [176]; and error, if any, in the judge's instructions regarding intoxication created no substantial risk of a miscarriage of justice [176-177].

INDICTMENTS found and returned in the Superior Court Department on May 25, 1994.

The cases were tried before *Walter E. Steele,* J.

*Jonathan S. Sales* for Richard Hazard.

*David Keighley,* Special Assistant District Attorney, for the Commonwealth.

*Charles K. Stephenson,* for Scott Rose, was present but did not argue.

KAPLAN, J. The defendants Scott Rose and Richard Hazard were tried together and severally convicted of murder in the

---

[1]Six of the companion cases are against Rose; the remaining five are against Richard Hazard. In his brief, Rose indicates that only the murder conviction is the subject of his appeal.

second degree of fourteen year old Daniel Correia and of associated crimes as noted in the margin.[2] The murder occurred in the course of a drive-by shooting episode involving these defendants and two other men, Michael Reaves and Michael Coull (Reaves was separately tried; Coull pleaded guilty to manslaughter).

Hazard argues on appeal that the evidence was insufficient to prove he took part in a joint venture to murder Daniel Correia; and that the judge erred, after declining to sever the trial, in admitting evidence of statements by Rose implicating Hazard and, after such admission, in failing to instruct on how the jury might use the statements when considering Hazard's case. Rose and Hazard both contend that the judge's instructions on malice and intoxication were faulty. Hazard contends that the cumulative effect of the claimed errors created a substantial risk of a miscarriage of justice.

*Commonwealth's case.*[3] April 15, 1994, about 3 P.M., four men — Scott Rose and Richard Hazard (defendants) and two others, Michael Reaves and Michael Coull — came to Magnet

---

[2]The defendants Rose and Hazard stood trial on indictments charging them with murder, assault and battery by means of a dangerous weapon, firearms charges (possession of firearms without a license, possession of a shotgun without identification card, possession of a firearm with removed serial number, and discharging a firearm within 500 feet of a dwelling). Rose was indicted in addition for failing to stop for a police officer and operating a motor vehicle to endanger.

At the close of the Commonwealth's case, the judge allowed the defendants' motion for required findings of not guilty of possession of a firearm with removed serial number. The defendants were found guilty of all the other crimes charged.

The judge sentenced the defendants to life imprisonment on the murder conviction, to a concurrent from three to five year term for unlawful possession of a firearm, and to a from three to five year term, from and after the murder sentence, for assault and battery with a dangerous weapon. The other convictions were placed on file with the defendants' consent.

[3]Main witnesses for the Commonwealth about the first encounter in the park and the drive-by shooting were Joseph Correia, Michael Santos, and Shane and Landon Arnum. About the drive-by, Stephen Pina, Ernest Chevalier, and Lacy Gomes also testified. Patricia Chaney and William Watson testified about the lending of a shotgun. There were other witnesses about the high speed chase and treatment of the victim.

Defense witnesses included Debra Cordeiro (Hazard's fiancée), police officers called to impeach some testimony of Commonwealth witnesses, and a child who testified to seeing men, one of whom was carrying a gun, in the vicinity of the park.

Park (outside the United Front housing project in New Bedford) in Rose's gray Lincoln Town Car. Hazard came up to Joseph Correia, eighteen years old, and asked if he had any dope (meaning heroin) for sale. Correia and Hazard then walked toward Hazard's companions — Rose, Reaves, and Coull — who were waiting near the Lincoln car. Correia's friends, Michael Santos and Shane and Landon Arnum, were nearby. Reaves drew out $80 or so and asked for the drugs. Correia grabbed the money and said, "We don't sell no drugs out here. Leave."[4] Reaves turned to Landon Arnum, whom he knew, and asked Landon to tell Correia and his friends, "I ain't no punk. I'm from the old school." Then he asked for his money. Santos urged Correia, "Just give him the money back. It's his first time coming here. He didn't know there was no drugs here." Correia handed the money to Reaves and said, "All right. You got your money. Just leave. Now you know there ain't no drugs here." Reaves said, "If you want to rob me, do it right," and pulled more cash out of his pocket and started waving it about, and began taunting Correia, walking toward him, repeating, "Come on, do it right." Correia was backing away.

Shane Arnum stepped in, saying there was no problem, and Reaves should leave. Soon Reaves and Shane began arguing. In the midst of it, Shane threw a punch. It hit Reaves in the jaw and knocked him senseless to the ground. Rose picked Reaves up and commenced carrying him to the car. Correia testified he heard Rose say, "We'll be back." Rose put Reaves in the back seat, and the other three got into the car (Rose to drive). One of them, presumably Rose, said, "We'll be back to spray it up." One said, "Who got the strap [street lingo for a handgun]?" As the car drove off, there was a collective yell, "We'll be back. We'll be back."

Two hours later, about five o'clock, the four appeared at a house in Taunton that Patricia Chaney shared with William Watson. Chaney and Watson knew Rose well. In front of his companions and Chaney, Rose said to Watson, "I need a favor from you." Rose and Watson entered the parlor alone and, Watson testified, Rose said, "I need one of your guns, man, all my friends are packing and I need one of your weapons. I don't got one." Rose also told Watson that one of his friends got beat up pretty badly and he wanted to take care of the people who beat

---

[4]There was testimony from Correia and other witnesses, all United Front residents, that they worked to keep the park free of drugs.

up his friend. And, "I need one of your weapons to go straighten out a situation that one of my boys got themselves into earlier."

Watson said he opened his gun cabinet and drew out a Winchester twelve-gauge pneumatic pump shotgun that held six shells.[5] Hazard entered the parlor and asked whether the gun was twelve-gauge; he knew how to load that, he had handled twelve-gauge shotguns before. Hazard said he probably had shells to fit the gun. Watson handed the gun and some green shells to Rose. The men put the gun and a broom in a trash bag[6] and drove off in the Lincoln, Rose driving.

About seven that evening, Joseph Correia was in Magnet Park with his brother Daniel, fourteen years old, and other friends. It was still light outdoors. The brothers were leaning on a white car, talking. Joseph Correia testified he heard tires screeching and looking up saw the Lincoln driving past on Middle Street. The driver's side faced toward him. He saw a big pistol coming out of the rear driver's side window, heard shots, and saw flashes from both driver's side windows. He saw Rose, the driver, leaning back in his seat as he drove. Joseph and Daniel started to run when they heard the shots. As they took off, Joseph was hit. He dived behind the white car, landing beside Daniel, and at the same time heard Daniel yell, "I got hit. I got hit." Joseph had been struck in the leg, Daniel in the heart.

Steven Pina, a visitor to the project, was standing by his car parked on Cedar Street near the park when he saw the Lincoln drive up Middle Street swerving and making noise. The car slowed as it passed the park, and Pina saw a gun coming out of the back window. At first it looked like someone showing the gun, then he heard shots from the car. Landon Arnum, who knew Reaves, said the shooter in the back of the Lincoln was Reaves. Pina said the driver leaned hard into the back of the seat, with only his left hand on the steering wheel; then Pina saw the barrel of a shotgun coming out the driver's window, across the driver's body. Santos testified he heard the screeching tires and gunshots, then saw the driver lean back and ejected shells going by the driver's face. Chevalier saw the front seat passenger, identified by him as Hazard, point a shotgun across

---

[5]Watson had a gun license and owned several firearms.

[6]Chaney testified she didn't want people walking out of her house with weapons uncovered.

the driver, while the driver leaned back and "scrunched down." Chevalier also saw a handgun being fired from the rear window.

Lacy Gomes, an emergency medical technician, heard the commotion from his apartment in the project. He saw the car screeching away and many people in the park picking themselves up from the ground, yelling, screaming, crying, hugging. Gomes called the police and went downstairs. He saw Daniel Correia lying on the ground, without breath or pulse. As Gomes started mouth-to-mouth resuscitation and CPR, an ambulance came and took the brothers to St. Luke's Hospital. A bullet had entered Daniel's heart from front to back and downward through the right side, lodging near his kidney. He was dead at 7:55 P.M.

Meanwhile, the Lincoln sped toward Taunton on Route 140, followed by police. Andrea Comeau, in the same direction on Route 140, saw a dark object being thrown from the passenger rear window of the Lincoln. The car chase, which at times involved speeds over 100 m.p.h., ended in Taunton where the route narrows, as the car crashed into a police cruiser. Coull was thrown partway out of the car and hung unconscious from the left rear window. Hazard threw a shotgun from the front passenger window, then got out and ran. Officer Troy Madeiros blocked Hazard's path with his car, then followed on foot and tackled him. The shotgun was identified by Watson as the one borrowed from him that day.

Police later found in the area indicated by Comeau a nine millimeter handgun (two serial numbers obliterated) and next to it a fifteen-round magazine containing three live rounds. Near the Lincoln, police found the shotgun with two live rounds. On the driver's front floor was a green spent shotgun shell; on the floor near the front passenger's seat, a knife in a sheath, and a used red shotgun shell. Three used nine millimeter cartridge casings were taken, one from the rear seat, one from the rear seat floor, another from the space between the front passenger seat and door. A police chemist found (consistent with firearms' discharge) traces of lead residue on the dashboard, steering column, window base, and armrest on the driver's door, and the driver's side rear door.

Daniel Correia had been shot with the nine millimeter gun thrown from the Lincoln in the Comeau-indicated area during the chase. The three spent cartridges had been fired from the discarded gun. The two spent shotgun shells (one red, one green) found in the Lincoln had been fired from the shotgun thrown from the car at the end of the chase.

The Correia boys were the only persons shot in the escapade. Bullets from the nine millimeter gun struck a parked car of Christie Reberio; two shotgun pellets lodged in the third-floor walls of 343 Middle Street (part of the project), and there were bullet holes in the door of that house. A window frame of an apartment at 341 Middle Street held one bullet (it could have come from the nine millimeter).

*Defense case.* Debra Cordeiro, Hazard's fiancée, testified that about 1 P.M. that day she dropped Hazard off at a bar in Taunton and forty-five minutes later saw him outside the bar drinking malt liquor with Coull and Reaves. Between 5:30 and 6 P.M. the four men came to her apartment: "[T]hey were all drunk, as far as I was concerned" but "not staggering, not falling down." Hazard stayed, the others left. Five minutes later, Rose returned, asked to speak with Hazard who had been on the bed, shirtless, watching television. After talking to Rose, Hazard dressed and left with Rose.

The defendants called John Burgos, III, an eight year old at the time of trial. On some day in April, 1994, the witness said, he heard gunfire near Magnet Park, and five to ten minutes later he saw three men walking in the park carrying a gun pouch. Officer Debra Binning testified Burgos told her he heard shots on April 15 and saw three men running through the woods, one carrying a gun.

The defense called investigating officers as witnesses to impeach Landon Arnum, Joseph Correia, and William Watson by statements these men originally gave the police inconsistent in particulars with their testimony for the prosecution at trial. In cross-examination of Commonwealth witnesses to the drive-by shooting, the defense had tried to show contradictions in their stories.

1. *Joint venture.* Hazard, arriving with the others in the Lincoln, participated in the first scene at Magnet Park — indeed initiated it by asking Joseph Correia whether he had dope for sale. He witnessed the altercation that left Reaves on the ground. He heard and probably joined vocally with the others in the promises to return, meaning a return to save face and to inflict more than equal damage and to achieve retribution or revenge. Within short hours thereafter Hazard is found with his companions on a visit to Watson, who in Hazard's presence is solicited to provide a weapon for Rose; the precise use to which the lethal equipment will be put is plain enough, and Hazard

indicates he knows how to work the shotgun that is supplied, and probably has available shells to fit. Again within a couple of hours the four men, joining with a single object in mind and enough armament to carry it out, enter the Lincoln automobile. Hazard is in the front passenger seat. The car reaches the designated turf and lays on speed and confusion of movement and the men commence the "spray" earlier foretold. Hazard is an actor in the shootout — probably, as in Chevalier's testimony, he shot across Rose, the driver, as Rose drew back to allow the maneuver. Hazard discards the shotgun in his hands as the police close in, and it is possibly his own red shells that are found in the vehicle.

We have here the classic pattern of a joint criminal venture for which the participants are all responsible even if they contribute individually to the criminal goal in different or unequal ways. The judge was right to deny defense motions at the close of the Commonwealth's case and at the end for required findings of not guilty.[7] For Hazard "was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995), quoting from *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988). The Commonwealth had to show that Hazard shared with the others the mental state required to encompass the crime of murder, see *Commonwealth* v. *Pucillo*, 427 Mass. 108, 112 (1998), and here the jury could well "infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). If Hazard himself intentionally fired a gun in the direction of other persons, as evidently he could be found to have done, malice aforethought on his part could readily be inferred (the so-called third prong of malice), see *Commonwealth* v. *Mack*, 423 Mass. 288, 290 (1996), but so could it be inferred from his presence in the car and his earlier participation in the criminal enterprise, even though the intentional shooting was done by his companions. See *Commonwealth* v. *Young*, 35 Mass. App. Ct.

---

[7]On motion for a required finding we ask, after viewing the evidence in a light most favorable to the Commonwealth, whether a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979).

427, 435 (1993). Hazard argues that the proof against him fails because there was no evidence that he knew Reaves had, and planned to use, the nine millimeter gun that killed Daniel Correia, but such particularized knowledge or complicity is not needed to base joint-venture liability: it is enough that Hazard could expect, and acquiesced in, behavior of that type from any of the companions. The case of *Commonwealth* v. *Green*, 420 Mass. at 779, cited by Hazard, is not to the contrary; the evidence there suggested that the defendant acted alone; there was no principal.

2. *Rose's extrajudicial statements.* Hazard argues essentially that Rose's statements to Watson should have been excluded under the familiar *Bruton* principle, see *Bruton* v. *United States*, 391 U.S. 123, 135-136 (1968); *Commonwealth* v. *Adams*, 416 Mass. 55, 58 (1993) — the matter was so serious that the trial should have been severed to begin with, as Hazard argued unsuccessfully pretrial. We shall assume, though the point is debatable, that Rose's statements so powerfully implicated Hazard as to raise the *Bruton* question. See *Commonwealth* v. *Wilson*, 46 Mass. App. Ct. 292, 298 (1999). *Bruton* is altogether irrelevant if the existence of a joint venture is sufficiently established by other admissible evidence, and the statements are made in the pendency of the venture and in furtherance of its goal. See *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 340 (1983); *Commonwealth* v. *Nascimento*, 421 Mass. 677, 680-681 (1996). Whether these predicates existed should have been submitted to the jury under a proper instruction, but counsel did not adequately raise the point.[8] We think, however, that the omission did not threaten a serious defect in the conviction because the venture was, in our judgment, already underway at the time, and thus the jury could properly consider evidence of the statements, like admissible evidence generally, for what it might be worth. Going even to the end of the line and granting for purposes of argument that the evidence was inadmissible because uttered before the venture was fairly started, we think the assumed error of admitting it was harmless beyond a reasonable doubt in relation to the substance of the whole case, and would not have contributed to vitiating the verdict. See *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 (1987). There was

[8]Counsel for Hazard submitted such an instruction with other proposed instructions but did not object when the judge omitted to give it. See *Commonwealth* v. *Grenier*, 415 Mass. 680, 686 n.8 (1993).

enough to convict Hazard (and Rose as well) if, disregarding most of what happened earlier, we look at the four men as they enter the Lincoln, with equipment, headed for the drive-by shooting at Magnet Park. To convict for participation in this joint venture, the Commonwealth need not have proved an "anticipatory compact" — it was enough that the men acted together with consciousness of the criminal goal at the moment of their setting forth. See *Commonwealth* v. *Fidler*, 23 Mass. App. Ct. 506, 513 (1997).[9]

3. *Instructions on malice.* After remarking that "malice" in ordinary speech differed in meaning from malice in a legal context, the judge in his main charge and response to jury questions[10] defined malice in terms of the three "prongs" of *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987), and accurately represented the Commonwealth's burden. The court suggested in *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995), that judges should charge in *Grey* terms "with such additional explanations as may be appropriate to the understanding of those concepts." Besides his introduction, the judge added to *Grey* a reference to "killing of a human being without justification or excuse." Both defendants argue that this shifted the burden improperly, but in the light of the basic charge assigning the burden we think the criticism is overdrawn, and the wording indeed not unhelpful. Further, the defendants single out the judge's statement that malice "includes" the three prongs and suggest that the jury would then consider themselves free perhaps to invent and find the facts to support a prong of their own. We think this highly unlikely; the judge made it clear that the Commonwealth must prove one or another of the three distinct propositions. In *Commonwealth* v. *Ferreira*, 417 Mass. 592, 597-598 (1994), the judge's instructions upheld by the court were substantially as in the present case with the phrase "malice aforethought includes."

4. *On intoxication.* There was some evidence through Debra Cordeiro's testimony that the defendants may have been drunk at the time of the drive-by. The defendants sought instructions on how the jury could use this evidence in relation to intent and

---

[9]What we have written will answer also Hazard's attack on the admission of evidence of Rose's original threat to revisit the place and "spray" it.

[10]The jury asked for clarification of the instructions on murder in the first and second degrees and on manslaughter. Later they asked for the definitions of malice and afterthought.

premeditation. Although conceding that parts of the judge's charge were sound, they now argue other remarks were confusing or incorrect. The jury were told that the actor's intoxication could not serve as a justification or excuse for a killing, but it could bear on whether the Commonwealth had proved each element of the offense beyond a reasonable doubt: if "the defendant's use of alcohol made him incapable of forming malice aforethought, of acting with malice aforethought, you may not find him guilty of murder." The judge also said the level of intoxication "must be substantial" before it could negate the defendant's "capacity to form the intent necessary for murder." We do not agree that these instructions would induce the jury to disregard evidence of intoxication in considering the issue of intent. On the contrary, the instructions were compatible with the jury's job to "consider credible evidence of the effects of the defendant's consumption of drugs [or alcohol] in deciding whether the Commonwealth had met its burden of proving the defendant's state of mind beyond a reasonable doubt." *Commonwealth* v. *Sires*, 413 Mass. 292, 300 (1992). (The remark that the level of intoxication must be substantial, etc., was not a happy one, but it may pass, see *Commonwealth* v. *Purcell*, 423 Mass. 880, 882 [1996].)

The judge said, "If you find, not that they were just drunk but if they were so drunk that they could not form an intelligent intent to join in the criminal enterprise, of course, then you should find them not guilty." The defendants object that this "finding" language improperly laid a burden on them. In truth there is no burden of proof on either side regarding intoxication, rather, intoxication is a subsidiary factor in the evaluation of whether the Commonwealth has proved a requisite state of mind beyond a reasonable doubt. See *Commonwealth* v. *Waite*, 422 Mass. 792, 805 (1996). "Finding" language has thus been disfavored, but it has not called for stronger measures where, as here, the instructions have demanded proof of each element of the offense beyond a reasonable doubt. See *ibid*. The misprision, in any event, "is not as prejudicial as is parallel finding language in the case of 'complete, malice-negating defenses.' " *Commonwealth* v. *Purcell*, 423 Mass. at 882, quoting from *Waite*, *supra*. The defendants, we may add, did not object at the time to the instructions about intoxication.

*Judgments affirmed.*