## Commonwealth *vs.* Jeffrey Hardy.

Middlesex. January 7, 2000. - May 9, 2000.

Present: Marshall, C.J., Abrams, Lynch, Greaney, Ireland, Spina, & Cowin, JJ.

*Homicide. Jury and Jurors. Practice, Criminal,* Mistrial, Jury and jurors, Disclosure of evidence, Admissions and confessions, Instructions to jury, Argument by prosecutor, Polling of jury, Capital case. *Evidence,* Admissions and confessions, Common criminal enterprise, Consciousness of guilt.

Where, at a view in a murder case, the jury were exposed to spectators who shouted from a distance that the defendant was guilty, the judge immediately and correctly instructed the jury to disregard the comments and, upon returning to the court house, properly conducted an individual voir dire of the jurors: the record of the proceedings fully supported the judge's conclusion that the jury remained fair and impartial. [391-392]

At a murder trial, the defendant did not demonstrate any prejudice from the Commonwealth's late disclosure of a statement of the defendant such as would warrant ordering a new trial. [392-393]

At a murder trial, confessions of the defendant's coventurers, made after the killing, were properly admitted in evidence, where there was evidence in the record to support a finding by the jury that a joint venture continued to exist at the time the statements were made. [393-394]

At a murder trial, properly admitted evidence of the defendant's false statements to police warranted the judge's instructing the jury on consciousness of guilt [394-395], and the judge did not abuse her discretion in declining to give an instruction based on *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980), regarding the asserted inadequacies of the police investigation [395].

There was no merit to a criminal defendant's claims that the prosecutor improperly commented on the defendant's failure to produce evidence; mischaracterized the evidence concerning the police investigation; or improperly vouched for the credibility of an immunized witness. [395-396]

At a murder trial the prosecutor exceeded the bounds of proper argument by personalizing the process by which a witness was granted immunity and by invoking the name of this court to vouch for the witness's credibility; further, the prosecutor improperly implied that the defendant had killed before, which was inflammatory and unwarranted by the evidence: in the circumstances, but for the judge's correct and thorough instructions specifically addressed to the prosecutor's improper remarks, the defendant would have been entitled to a new trial. [396-398]

There was no error in a Superior Court judge's denying the defendant's request to poll the jury after the verdict was recorded, where the judge's

own observations of the jury did not perceive any "public disagreement" with the verdict by any juror as the verdict was received. [398-400]

INDICTMENT found and returned in the Superior Court Department on June 23, 1994.

The case was tried before *Elizabeth J. Dolan*, J., and a motion for a new trial, filed on July 30, 1997, was heard by her.

*Rosemary Curran Scapicchio* (*Melissa Carter* with her) for the defendant.

*Eric R. Barber-Mingo*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. The defendant was convicted by a jury of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty.[1] Represented on appeal by trial counsel, the defendant argues that the following were prejudicial error: (1) the denial of his motion for a mistrial after jurors heard comments from spectators while on a view; (2) the late disclosure of evidence by the prosecution; (3) the admission of the codefendants' confessions after severance; (4) the instruction to the jury on consciousness of guilt and the failure to give a "*Bowden* instruction" (see *Commonwealth* v. *Bowden*, 379 Mass. 472 [1980]); (5) various errors in the prosecutor's closing argument; and (6) the denial of his request to poll the jury individually. We have examined all of the issues raised by the defendant, and have reviewed the entire record under G. L. c. 278, § 33E. We affirm the conviction.

1. *The facts.* The victim's body was discovered in a park in Medford on April 28, 1994, at about 5:30 A.M. The victim's body had a total of seventy-nine stab wounds to the head, face, neck, chest, arms, legs, and back, as well as a gunshot wound to the face. The medical examiner testified that it was possible the victim had been alive during the infliction of all the injuries.

The Commonwealth's primary witness at trial was Christopher Rogovich, who had been granted immunity by a single justice of this court. See G. L. c. 233, § 20D. Rogovich testified as follows. On the day of the murder, Rogovich, the defendant, Gerald Sullivan, Richard Allison, and the victim, among others, spent the afternoon playing basketball and drinking beer. Some time during the afternoon, Sullivan and the defendant left

---

[1]The defendant was acquitted of armed robbery and larceny from the person.

to buy some marijuana treated with PCP, or "angel dust." Sullivan and the victim smoked some of the drug that afternoon, and again in the evening, while the group was at a friend's house. The effects of the drug were not very strong, and the victim talked about how the drug was "fake," that Sullivan and the defendant had "got beat," and were "chumps" and "idiots." The victim persisted with similar comments throughout the day, and seemed to upset the defendant. While the group was at the friend's house, the defendant left for approximately fifteen minutes, and when he returned he showed Rogovich a gun that he had tucked into his pants.

Rogovich further testified that the group subsequently went to a local bar. After staying about one hour, the defendant said, "Let's get out of here, let's go for a ride." The defendant did not want the victim to go along with them, but the victim caught up to the defendant, Rogovich, Allison, and Sullivan as they got into the defendant's car. The defendant dropped off Rogovich and the victim a short distance from a Dunkin' Donuts and whispered to Rogovich, "Try to lose [the victim]." Eventually, all five returned to the car, but the defendant wanted the victim to go home, and the two argued about it. At one point, the victim got out of the car, calling the defendant and Sullivan "fuckin' punks" as he did so. The defendant yelled back, "Do you want to come . . . ? Get in the fuckin' car." The victim got into the car and the defendant sped off. After driving for a while, the defendant pulled the car over, and the defendant, Sullivan, and Allison got out of the car, walked a few feet away, and spoke together. When they got back into the car, the defendant said, "We got to go meet the dealer." The defendant drove to a nearby park, directed everyone to a certain area, and told them where to stand, saying that the drug dealer "should be coming this way." When Rogovich turned around, Sullivan was pointing a gun at the victim's head. Rogovich heard three clicking noises and then saw the defendant grab the gun. Rogovich had started to move away, and when he turned around to look, he saw the defendant shoot the victim and heard the victim say, "Hardy shot me in the mouth." The defendant replied, "Now you'll shut your fuckin' mouth." When Rogovich turned back again, he saw the defendant, Allison, and Sullivan on top of the victim making stabbing motions, and he heard Sullivan say, "Get his wallet." Rogovich returned to the defendant's car

where he was joined shortly by Sullivan, who was carrying a bloody knife. Sullivan told Rogovich to get in the car, drove him to a nearby house, and called for a taxi for him. The next day, the defendant stopped by Rogovich's house and told him, "Don't say nothing, they'll get you ten years down the line for this . . . ."

In addition to Rogovich, the Commonwealth's other chief witness was Steven Murphy. Murphy testified that around 9:30 P.M. on the night of the murder, the defendant and Sullivan came to his house to retrieve a gun, and that the defendant said they needed it because they had been "ripped off" on a drug deal. Around midnight, Allison showed up at Murphy's house, nervous and sweating. Five to ten minutes later, Sullivan and the defendant arrived, and Sullivan, Allison, and Murphy went into a bedroom to talk. Sullivan asked Allison how much money they had gotten, Allison counted some money, gave some to Sullivan, and told him to give one-half to the defendant. Allison and Sullivan left by separate taxis. An hour or so later, Murphy woke the defendant, who had fallen asleep on the living room floor, and asked him what had happened. The defendant said, "We did what we had to do." When Murphy saw the defendant the next day, he told the defendant, "That was a pretty sick thing that you did." The defendant responded, "Did you hear how many times we got him? Eighty times."

The defendant presented a defense of alibi and testified at trial. His account of the day of the murder was, in large part, consistent with Rogovich and Murphy's account, except for the following. First, the defendant denied that anybody had thought the angel dust was fake or that the victim had taunted him about that. The defendant testified that Sullivan had said the drug was "weird," but that the drug dealer had subsequently explained the problem and how to remedy it. Second, the defendant denied retrieving a gun. Third, the defendant testified that he and Sullivan alone had left the bar at 11 P.M. and gone to the Dunkin' Donuts, and that they had done so in an attempt to buy more drugs. The defendant testified that from the Dunkin' Donuts, Sullivan had dropped him off at his grandfather's house, that Sullivan had picked him up about forty-five minutes later, and that they had driven to Murphy's house from there. Finally, the defendant denied that Allison was present at Murphy's apartment that night, and he denied making any inculpatory state-

ments to Murphy. The defendant's grandfather corroborated the defendant's alibi.

The Commonwealth introduced evidence contradicting the defendant's account of the evening, including (1) two women, who had spent the day of the murder with the group of men, testified that all five men left the bar at the same time; (2) one of the women testified further that Allison returned to the bar about one hour later, and that she had walked to Murphy's house with him; (3) a third female witness testified that she saw and briefly spoke with the victim at the Dunkin' Donuts at about 11 P.M. on the night of the murder; and (4) two narcotics officers, who were on an unrelated surveillance at the Dunkin' Donuts on the night of the murder, testified that they observed the defendant's car in the parking lot at about 11 P.M., and that they saw two men cross the street and eventually get into the car.

2. *Denial of postview motion for a mistrial.* At the start of the trial, while the jury were on a view of the park where the victim's body was found, spectators shouted some words at the jury from across a field. The judge immediately instructed the jury to disregard the comments. When they returned to the court house, the judge conducted an individual voir dire of all the jurors, during which she asked the jurors what, if anything, they had heard, whether it had had any influence on them, and whether they were able to remain fair and impartial. Of the sixteen jurors, fourteen stated that they had heard either the defendant's name, the word murderer, or the phrase, "Jeffrey Hardy is a murderer." All jurors denied that the incident had affected or influenced them and all affirmed their ability to remain fair and impartial. At the close of the voir dire, the defendant moved for a mistrial. The judge concluded that the jury remained indifferent and denied the motion.

On appeal, the defendant does not argue that the judge failed to follow the proper procedure in determining whether the jurors were improperly influenced by the extraneous matter. See *Commonwealth* v. *Jackson,* 376 Mass. 790, 800-801 (1978) (when jurors are exposed to potentially prejudicial extraneous material, judge should conduct individual voir dire to determine extent of exposure and effects of exposure on juror's ability to render impartial verdict). Rather, the defendant argues that, because the spectators' shouts created a high probability of prejudice, we should disregard the findings of the judge and presume that the

jury were improperly influenced. We have not done so before, see *Commonwealth* v. *Kamara*, 422 Mass. 614, 620 (1996), and decline to do so now.

Here, the jury's exposure to the extraneous matter clearly created the potential for prejudice. The judge, however, immediately cautioned the jurors to disregard anything they may have heard, and subsequently engaged in a careful and thorough questioning of each juror. We give substantial deference to the trial judge who is in the best position to evaluate all the circumstances of the exposure to the extraneous matter, and its actual prejudicial effect. See *Commonwealth* v. *Daughtry*, 417 Mass. 136, 147 (1994). The record here fully supports the judge's conclusion that the jury remained fair and impartial, and the defendant's motion was properly denied.

3. *Late disclosure of evidence.* Several days before opening statements, the Commonwealth disclosed new evidence of a statement made by the defendant. One day before the disclosure, Christopher Rogovich informed the district attorney he remembered that, after the defendant shot the victim, the defendant said, "Now you'll shut your fucking mouth." The defendant did not move for a continuance or to exclude the evidence. The defendant now argues he was prejudiced by the delayed disclosure because the statement was strong evidence of the Commonwealth's theory of motive, and the Commonwealth had previously lacked such evidence.

Before we consider whether a new trial may be warranted, the defendant must demonstrate "material prejudice from the [delay in] disclosure." *Commonwealth* v. *Hamilton*, 426 Mass. 67, 70 (1997), and cases cited.[2] When measuring prejudice, it is the consequences of the *delay* in disclosure that are relevant, not the likely impact of the nondisclosed evidence. See *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980). In this case, the defendant has made no showing of prejudice from the delay in disclosure. The defendant has offered no explanation of how trial tactics would or should have changed had the defendant been aware of this evidence earlier. See *Commonwealth* v. *Cundriff*, 382 Mass. 137, 151 (1980), cert. denied, 451 U.S. 973 (1981) (defendant must show prejudice by late disclosure and how new trial would remedy that prejudice). Further, defense counsel was allowed to cross-examine Rogovich fully concern-

[2]The defendant makes no claim of bad faith related to the disclosure.

ing the circumstances of the statement and the circumstances
and timing of his sudden recollection of the statement. *Commonwealth* v. *Costello*, 392 Mass. 393, 398 (1984) (defendant's
opportunity to cross-examine extensively regarding previously
undisclosed testimony effectively removed any prejudice). The
defendant is not entitled to a new trial on this ground.

4. *Admission of codefendants' confessions.* Steven Murphy
testified, over the defendant's objection, that, shortly after they
arrived at his house on the night of the murder, both Richard
Allison and Gerald Sullivan separately had confessed to him.
Murphy testified that Allison had told him that he, Sullivan,
Rogovich, and the defendant had just killed the victim. Murphy
also testified that Sullivan, while not implicating the defendant,
described how he (Sullivan) had participated in the killing. The
defendant was not present in the room when either statement
was made. The judge allowed the testimony under the joint
venture exception.

Under the joint venture exception to the hearsay rule, "[o]ut-
of-court statements by joint criminal venturers are admissible
against the others if the statements are made during the
pendency of the criminal enterprise and in furtherance of it."
*Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994). The joint
venture must be proved by evidence other than the out-of-court
statements, and the exception applies only as long as the
criminal enterprise continues. See *Commonwealth* v. *Colon-
Cruz*, 408 Mass. 533, 543 (1990). The defendant argues that the
statements should not have been admitted because the Com-
monwealth failed to present evidence that a conspiracy
continued at the time the statements were made.

Our review of the record reveals, however, that the Com-
monwealth introduced sufficient evidence to warrant a finding
that the defendant, Allison, and Sullivan jointly conspired to kill
the victim, and that the venture was not over when Allison and
Sullivan confessed to Steven Murphy. See *Commonwealth* v.
*Bongarzone*, 390 Mass. 326, 340 (1983) (there must be evidence
to support finding of common venture at time statements made).
In addition to the testimony of Rogovich, the Commonwealth
introduced evidence that the defendant, Sullivan, and Allison
gathered at Steven Murphy's house very shortly after the
murder; Allison and the defendant asked Murphy for various
items of clothing; and Allison asked for help locating a place to

go and for advice about getting rid of the gun. See *Commonwealth* v. *Colon-Cruz, supra* at 536, 545 (efforts to conceal evidence and to avoid detection warrant inference that joint venture continued); *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993). Further, the judge thoroughly instructed the jury on the law of joint venture, including an instruction that the jury, in order to consider the codefendants' statements, must first find that a joint venture existed at the time the statements were made. See *Commonwealth* v. *Clarke, supra.* As there was evidence in the record to support a finding that the joint venture continued, the confessions were properly admitted.[3]

5. *Jury instructions.* The defendant argues the judge committed two errors while instructing the jury. First, he argues that the judge erred by instructing on consciousness of guilt because the record did not warrant the instruction.

At trial, the Commonwealth introduced evidence that the defendant denied he was at the Dunkin' Donuts on the night of the murder until he was shown the "teletype item" indicating that the police "had run" his registration, at which point he admitted to the police that he had lied. Such "[f]alse statements made to the police are a standard example of admissible evidence on consciousness of guilt." *Commonwealth* v. *Carrion*, 407 Mass. 263, 276 (1990). The defendant argues, however, that he lied to the police because he feared implicating himself in a drug transaction, and that, therefore, the denial

---

[3]The defendant also argues that the statements by Allison and Sullivan should not have been admitted because the Commonwealth conceded, at the hearing on the motion to sever, that the confessions created a *Bruton* problem and that Sullivan's statements would not be admissible against the defendant if the two were tried together. See *Bruton* v. *United States*, 391 U.S. 123, 124, 137 (1968) (admission at joint trial of nontestifying codefendant's confession inculpating defendant, not made in defendant's presence, violated confrontation rights, and error could not be cured by instructions). The motion to sever was not opposed by the Commonwealth, and was allowed by a judge other than the trial judge.

We do not think the Commonwealth's failure to oppose a motion to sever and its acknowledgment of the potential for a *Bruton* problem should automatically preclude the Commonwealth from subsequently moving in limine to introduce inculpatory statements, particularly where, as here, there is a valid basis for introducing the statements. See *Commonwealth* v. *Rose*, 47 Mass. App. Ct. 168, 175 (1999) (*Bruton* irrelevant if statement made during and in furtherance of joint venture). Furthermore, the defendant has presented no evidence that the Commonwealth intended its concession regarding the admissibility of Sullivan's statements to be binding, or that the defendant understood it to be so.

was not sufficiently related to the murder investigation to constitute evidence of consciousness of guilt of murder. Although the evidence could show that the defendant lied because of involvement in a drug transaction, it could also show that the defendant's false statements were motivated by the murder. As such, they were properly admitted. See *Commonwealth* v. *Jackson*, 419 Mass. 716, 731 (1995) (defendant's argument that he misrepresented his name to police because of unrelated crime went to weight, not admissibility, of consciousness of guilt evidence). Because the evidence was properly admitted, there was a basis in the record for a consciousness of guilt instruction, and there was no error. See *Commonwealth* v. *Simmons*, 419 Mass. 426, 435 (1995); *Commonwealth* v. *Haraldstad*, 16 Mass. App. Ct. 565, 570 (1983).

The defendant also argues that the judge erred by declining to give a requested *Bowden* instruction. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980). We dispose of this claim by briefly stating that we have never held "that a judge *must* give instructions on the claimed inadequacies of a police investigation" (emphasis supplied), *Commonwealth* v. *Daye*, 411 Mass. 719, 741 (1992), and we decline to create such a rule even where, as here, the inadequacies of the investigation were a main theory of the defense. The defendant was allowed adequately to explore the alleged deficiencies and argued them extensively during closing. Whether to give a *Bowden* instruction was within the judge's discretion, and there was no error.

6. *The prosecutor's closing.* The defendant claims that the prosecutor committed five errors in his closing argument, including misstating the evidence and vouching for a witness's credibility.

We address the first three claims briefly by concluding that the prosecutor did not improperly comment on the defendant's failure to produce evidence,[4] and in any event, the judge gave

---

[4]The prosecutor argued (objected to portion is italicized):

"Now, defense counsel has spent a lot of time in this trial trying to shift attention away from [the defendant]: 'Look at the Charlestown kids. What about the Somerville Project kids? . . . Well, let me ask you this, ladies and gentlemen. *What scintilla of evidence have you heard that could lead you to conclude that the Charlestown kids or the Som-*

comprehensive instructions on the burden of proof, see *Commonwealth* v. *Moore*, 408 Mass. 117, 128 (1990); *Commonwealth* v. *Smith*, 404 Mass. 1, 7 (1989); *Commonwealth* v. *Borodine*, 371 Mass. 1, 9 (1976), cert. denied, 429 U.S. 1049 (1977); that the prosecutor did not mischaracterize the evidence concerning the police investigation into suspects other than the defendant;[5] and that the prosecutor did not improperly vouch for the credibility of the immunized witness.[6] See *Commonwealth* v. *Chavis*, 415 Mass. 703, 713 (1993).

Regarding the defendant's other two claimed errors, we conclude that the prosecutor did indeed make improper arguments. First, and most troubling to us, the prosecutor personalized the process by which Rogovich was granted immunity, and attempted to use the authority of this court to vouch for his credibility.[7] When a witness's credibility has been attacked, it is entirely proper for the prosecutor to respond and to argue from the evidence why the witness should be believed. See, e.g., *Commonwealth* v. *Andrews*, 403 Mass. 441, 457 (1988).

---

*erville Project kids were in any way connected with the murder of [the victim]."*

[5]The prosecutor argued (objected to portion is italicized):

"Steve Murphy was picked up by the police within days . . . [a]nd he . . . told the police everything that he knew about Thomas Moran's murder. . . . *So while the police are finding out about the Charlestown kids, they're also finding out who killed [the victim]. . . . Does that explain to you why the police didn't pursue this Charlestown kids theory, when four days after the crime they know who killed [the victim]?"*

There was evidence at trial that Steven Murphy was arrested on an outstanding warrant on May 2, 1994, and gave a statement to the police at that time. There was also evidence that the police had learned about the "Charlestown kids" before Murphy was arrested, and that the police never investigated them.

[6]The prosecutor argued: "Why do you think Chris Rogovich took the Fifth Amendment? He was there. He's telling you the truth."

[7]The prosecutor argued:

"Was it the threats that made Chris Rogovich come forward? The evidence says no. The evidence says that Chris Rogovich only testified at this trial after the Supreme Judicial Court of our Commonwealth said, 'Mr. Rogovich, you are going to testify or you're going to be held in contempt and go to jail, and you'd better not lie. . . . You could be prosecuted for perjury.' "

Prosecutors may not imply, however, that they, or anyone else, have "special knowledge by which [they] can verify the witness's testimony." *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989). We need not look far to conclude that this argument exceeded the bounds of a proper argument. Secondly, the prosecutor also improperly implied that the defendant had killed before.[8] This implication was inflammatory and unwarranted by the evidence. See *Commonwealth* v. *Kelly*, 417 Mass. 266, 270 (1994) (arguments must be limited to evidence and fair inferences).

To determine whether a new trial is required because of these improper remarks, we consider their combined effect in the context of the argument and the case as a whole. See *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). We also consider whether the judge's actions or instructions may have mitigated the error, whether the errors related to central or collateral issues, whether defense counsel objected, whether the jury would be able to recognize the error as hyperbole, and the strength of the Commonwealth's case. See *id.*, and cases cited. In this case, the defendant objected to both improper remarks, the credibility of Rogovich was highly contested and central to the Commonwealth's case, the implication that the defendant had killed before was inflammatory, and while the Commonwealth's case was very strong, it was not overwhelming. We conclude that, but for the judge's correct and thorough instructions and particularly those instructions specifically addressed to the prosecutor's improper remarks, the defendant would be entitled to a new trial. In her final charge to the jury, the judge issued particularized and tailored instructions, which were specifically targeted at correcting the errors

---

[8]The prosecutor argued (objected to portion is italicized):

"Do you think we ever would have heard from Steven Murphy or gotten any statement from him if Jeff Hardy had killed some kid from the projects or killed some Charlestown kid? Do you think Steven Murphy would have talked to us? Of course not. . . . But Jeff Hardy and Richard Allison and Gerry Sullivan crossed over the line. *This time, they killed one of their own.*"

created by the prosecutor's improper inference that the defendant had killed before,[9] and the prosecutor's personalization of the immunity process.[10] The judge also described the protection afforded a witness by a grant of immunity, and instructed that the testimony of an immunized witness should be received with caution and weighed with care. We conclude that, while the prosecutor's improper arguments were egregious, they were not so prejudicial as to be irremediable, and the judge's approach was sufficiently aggressive to ameliorate the error created by them. See *Commonwealth* v. *Santiago, supra* at 499-502 (new trial required where defense counsel had vigorously objected and judge did not take aggressive approach to correcting errors in prosecutor's argument).

7. *Failure to poll the jury.* Immediately after the verdicts had been received and recorded, the defendant requested that the jury be individually polled. The judge denied the request, stating that the verdicts had already been recorded. Subsequently, the defendant filed a motion for a new trial on the basis of the failure to poll the jury. In support of the motion, the defendant

---

[9] The judge instructed the jury:

"There is a statement that I want to caution about. It was made during the Commonwealth's closing, where there was terminology, 'This is the first time that the defendant or defendants have crossed the line.' If that left an impression in the mind of any jurors that somehow there was any prior event simply because the terminology 'first time' was used, that should be totally disregarded and not considered at all . . ."

[10] The judge further instructed the jury:

"You have heard reference in this case to the term immunity, and we have had reference to the term immunized witness. Immunity is a process by which a petition is brought before the Single Justice of the Supreme Judicial Court, which is the court that handles that, simply, while the Grand Jury is still in session. And after consideration of the petition, that justice may grant, to a particular witness, immunity.

"During argument, the Commonwealth in its form, I suggest, personalized that as the Supreme Judicial Court instructing a particular witness. That was a personalization of that and it is not in that personalized form. This goes up by petition and the petition is allowed and it comes back in a form in which there is a statement by the justice, as with any other judge, instructing the limitations and under what circumstances."

filed two affidavits in which the defendant's mother averred that she saw one juror shake her head, "No," as the verdicts were read, and defense counsel averred that two jurors were crying as the verdicts were read and that one juror had collapsed in the hallway. In her memorandum of decision denying the motion, the judge stated that, while the verdicts were being received and recorded, she had deliberately focused on the juror identified in the affidavits, and that, "[w]hile it was obvious that the juror was visibly upset and nervously shaking, she was not shaking her head in a negative fashion discernible to this Court." The judge denied the motion based on her observations and because she believed that individual polling of jurors is not permitted after a verdict is recorded.

Before a verdict is recorded, it is within the trial judge's discretion whether to poll the jury. See Mass. R. Crim. P. 27 (d), 378 Mass. 897 (1979) ("When a verdict is returned and before the verdict is recorded, the jury may be polled in the discretion of the judge"). After a verdict is recorded, however, a judge should not poll the jury, based on a claim of a non-unanimous verdict, unless one or more of the jurors indicated a "public disagreement" with the verdict as it was being received. *Commonwealth* v. *Dias*, 419 Mass. 698, 703 (1995). To constitute a "public disagreement" with the verdict, the actions or words which allegedly constitute the juror's disagreement must be reasonably intelligible as a disagreement; actions such as crying would not constitute a disagreement as they are ambiguous. Additionally, the disagreement must be sufficiently public, that is, it must manifest itself outside the jury box, see *id.* (juror's whispered "no," even if heard by other jurors, not sufficient public disagreement); *Commonwealth* v. *Nettis*, 418 Mass. 715, 718 (1994) (juror's clearly spoken "no" to juror next to her and visible shaking of head sufficiently public), and the disagreement must occur at the same time as the verdict is being received and recorded. See *Commonwealth* v. *Martell*, 407 Mass. 288, 291 (1990) (denial of motion to poll jury not error where juror did not express disagreement with verdict until after it had been reached and announced). The judge in this case carefully observed the juror in question during the receiving and recording of the verdict and did not see the juror shake her head. The judge was entitled to rely on her own observa-

tions. The denial of the defendant's motion was within the discretion of the judge.

8. *Section 33E review.* Pursuant to our duties under G. L. c. 278, § 33E, we have reviewed the entire record. We find nothing that compels us to exercise our discretion to disturb the jury's verdict, either by reducing the verdict or granting a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*