## COMMONWEALTH vs. ANGEL DIAZ.

Hampden. November 10, 1997. - January 29, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Evidence,* Hearsay. *Homicide. Malice. Practice, Criminal,* Instructions to jury, Capital case.

At a murder trial, the judge's error in admitting in evidence inadmissible second level hearsay, tending to show deliberate premeditation on the defendant's part, was harmless error, where the hearsay was merely cumulative of the admissible statements of the defendant and other strong evidence reflective of his intent. [551-552]

At a murder trial, the judge correctly instructed the jury on deliberate premeditation as well as the first prong of malice, and there was no likelihood that the jury were misled by the judge's further instructions on the second and third prongs of malice, which were appropriate with respect to the other theory on which the case was tried, extreme atrocity or cruelty. [552-554]

INDICTMENT found and returned in the Superior Court Department on October 13, 1994.

The case was tried before *William H. Welch,* J.

*Peter M. Onek* for the defendant.

*Marcia B. Julian,* Assistant District Attorney, for the Commonwealth.

FRIED, J. The defendant, Angel Diaz, was convicted of murder in the first degree by reason of deliberate premeditation. He asks that the conviction be reduced to murder in the second degree because of an error in the introduction of a hearsay statement and because of error in the charge respecting the specific intent to kill in the definition of malice aforethought. We affirm the conviction of murder in the first degree and decline to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the degree of the conviction.

I

The killing arose out of grievances between the South Side

Posse and two other gangs, the Nietas and the Latin Kings. The victim, Jose Fonseca, was a member of the South Side Posse, which recently had inflicted a beating on a member of the Latin Kings. Fonseca had also provoked the Nietas by spray painting the initials "SSP" over a Nieta graffiti. When it was learned that Fonseca was visiting the second-floor apartment of Angel Lozada, his wife, and their children, a large group went to the back door of the apartment. In the group was Eric Garcia, a member of the Nietas. He asked Lozada to send Fonseca out so he could fight him because of disrespect Fonseca had shown Garcia and the Nietas. Lozada closed the door and when Fonseca did not come out, the group went to the front door and demanded that Fonseca be sent out. Fonseca resisted but was eventually dragged to the landing outside the apartment door and severely beaten. As Garcia ordered that the beating stop, the defendant came up the stairs wearing a black hood and carrying a gun. He held the gun over the railing and shot Fonseca four times, killing him. He was charged with murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty. The jury convicted on the first ground only.

There was never any real issue that Diaz killed Fonseca, and the focus of the trial was the state of mind with which the killing was carried out. Diaz went to the police station voluntarily when he heard that the police were looking for him. At the station he was arrested and confessed to the killing, after denying any participation in the killing in an earlier statement. According to the police officer who testified to Diaz's oral statement, Diaz said it was "[H]is decision. He said he knew he had to do it." In response to the prosecutor's question as to whether Diaz's gang had ordered the killing, the officer testified that Diaz said, "[T]here wasn't any sanctions. It's something that had to be done. There wasn't time to get paperwork."

Diaz's written statement, made shortly after his oral statement, stated that he went to the apartment house where Fonseca was visiting. When he arrived,

> "[T]he house was surrounded. . . . I mean the second floor apartment . . . . I stood watching the apartment from across the street. I already had black pants and a black sweatshirt on. The Nieta was trying to get the South Side out of the apartment. . . . After awhile, they took him out of the house and started beating on him. I ran

across the street, opened the door and listened until they got him out then I ran up the stairs and as soon as I got upstairs the South Side was sitting down crouched, crying. I took my gun out from under my sweatshirt and reached over the wood railing at the top of the stairs and shot him four times in the back. I know I shot him twice in the back of his side and I guess I hit him in the head. I saw him lean to the side and collapse towards the rear two doors . . . ."

Garcia testified that when he went upstairs to get Fonseca out of the apartment another member of the group, Eduardo Lopez, "had told me that [the defendant] had said to pull Joey [Fonseca] out of the apartment." Garcia went on to testify that at an earlier point, while he and the defendant were standing outside the apartment house, on being told that Fonseca was inside in a second-floor apartment the defendant had said, "Good. I'm here. I'm going to take care of him. Take him out. I'm going to kill him. . . . Take Joey out, bring Joey out." Garcia testified that he did not believe this threat, "because everybody says they're going to do something around that area and it's never done." Garcia was also charged with murder in the first degree in connection with the killing of Fonseca.

Edgar Rivera had been with Diaz at the apartment house but Rivera left before the group went to the front door of the apartment and got Fonseca out onto the landing. When he returned a short time later he heard about the shooting and went to Diaz's companion's apartment where he found Diaz. Diaz was distraught, and in a private conversation with Rivera said he had shot a member of the South Side Posse, but nothing was said about a plan or a mission to kill Fonseca. Diaz gave Rivera the gun he had used in the killing and asked him to "do something with it." Rivera went to the police station with Diaz and was arrested at that time, charged as an accessory after the fact of murder.

## II

Diaz moved to have his statements suppressed as involuntary and violative of his rights under *Miranda* v. *Arizona,* 384 U.S. 436 (1966). That motion was denied. He also received an instruction that the jury could not consider the defendant's statements unless the Commonwealth proved beyond a reason-

able doubt that they were made voluntarily and that he had received the Miranda warnings, understood them, and voluntarily waived his right to remain silent. Diaz makes no claim with respect to any of these matters in this appeal, and on our own inspection of the record under G. L. c. 278, § 33E, we find no defect.

## A

In this appeal Diaz claims that it was error to allow Garcia to testify that, as the group was milling about outside the house where Fonseca was visiting, Eduardo Lopez had said that he had heard Diaz say, "[P]ull Joey [Fonseca] out of the apartment." Defense counsel objected to the introduction of this statement. The judge acknowledged that the statement was inadmissible hearsay "as to the truth or falsity of the statement" but allowed it to be admitted "to show the general atmosphere of what was occurring and what was transpiring insofar as [the jury] find it has some affect as to the charges in this case." Considerable time and space were spent in the briefing and argument of this point.

The Commonwealth's position is indefensible. There is no exception to the hearsay rule such as the judge invoked. Moreover, because the only real issue in the case was Diaz's state of mind, Lopez's statement supported the Commonwealth's contention that Diaz had deliberately premeditated the killing. The judge's instruction to the jury to disregard the statement for its truth but to consider it only to "show the general atmosphere of what was occurring" was confusing and based on no valid legal principle. The prosecution should not have offered this statement. If it did so through inadvertence, it should have withdrawn it when the defense challenged it. It is poor practice for the prosecution to defend a court error, and to invite the attendant risks and delays in the hope that the error might escape attention. Nor should the Commonwealth on appeal persist in defending the indefensible.[1]

All that being said, this manifest error is simply too trivial in

---

[1] In its brief to this court the Commonwealth correctly identifies the double hearsay but "does not concede that this evidence was erroneously admitted." If the Commonwealth is asking that the law be changed, it should do so candidly. Otherwise a concession would have been in order and would indeed have been good advocacy, given the harmlessness of the error. The cases cited by the Commonwealth support only the latter point, not the unfounded claim

the context of the case as a whole. The double hearsay statement by Lopez, to the extent that it may have tended to show deliberate premeditation on Diaz's part — and it did that only indirectly and ambiguously — was merely cumulative of the much more impressive statement that Garcia testified that Diaz had made to him: "Good, I'm here. I'm going to take care of him. Take him out. I'm going to kill him. . . . Take Joey out, bring Joey out." And it was cumulative of Diaz's own oral statements to the police that "[T]here wasn't any sanctions. It's something that had to be done. There wasn't time to get paperwork," and that it was Diaz's decision: "He said he knew he had to do it." Finally, there were also the facts, which were not seriously disputed, that Diaz came up the stairs after the beating had stopped, that the hood on his sweatshirt was raised, that Fonseca was hunched and cowering, and that Diaz shot him four times. Defense counsel is correct in arguing that the credibility of Garcia, who was also charged with Fonseca's murder and thus had a motive to be helpful to the prosecution, was an important issue. But the erroneously admitted double hearsay could have done little to bolster Garcia's credibility because Garcia himself was the source of the Lopez statement.[2]

## B

The defendant was charged with murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty. The judge, using the language from *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605 (1978), correctly instructed the jury on deliberate premeditation:

> "To find deliberate premeditation, you must conclude and find that a defendant thought before he acted, that is, *that he formed some kind of plan, no matter how simple, to murder someone after he thought about it, contemplated it and that he thought before he acted.* . . . Deliberation does not require any extended time span . . . . It's not so much a matter of time as of logical sequence. The sequence

of admissibility of this double hearsay. At oral argument, the Commonwealth again did not concede that the Superior Court judge's admission of this hearsay evidence was an error until pressed to do so by this court.

[2] The defense cites a statement of this court in *Commonwealth* v. *Raymond*, 424 Mass. 382, 388 (1997), where a hearsay statement was improperly admitted but defense counsel did not object. We found that there was no substantial likelihood of a miscarriage of justice. A similar conclusion applies here.

would be first the deliberation and premeditation or the reflection, the mental reflection, *and then the decision or resolution to kill*. And lastly, the killing in furtherance of that resolution or decision.

"    . . . .

"To prove deliberate premeditation . . . the Commonwealth must show that *the defendant's resolution to kill* was a product of cool reflection, where the purpose is resolved upon and the mind determines to do it before the blow is struck." (Emphases added.)

The judge went on to describe three different kinds of malice aforethought. The defendant did not object to these instructions. He now complains that the judge did not explain that deliberate premeditation was incompatible with second or third prong malice, neither of which requires a specific intent to kill, *Commonwealth* v. *Judge*, 420 Mass. 433, 441-442 (1995), and thus the jury might erroneously have believed that they could find deliberate premeditation in the absence of such a specific intent to kill.[3]

Because the defendant was charged with murder in the first degree by reason of extreme atrocity or cruelty as well as deliberate premeditation, the giving of the instruction on second and third prong malice was appropriate, as a specific intent to kill is not necessary to a finding of murder in the first degree on that alternative ground. *Id.* at 442, quoting *Commonwealth* v. *Lacy*, 371 Mass. 363, 367 (1976). Certainly, it would have been better to make clear to the jury, as the defendant now argues, that murder in the first degree by reason of deliberate premeditation relates only to the first prong of malice. But given the lack of an objection by a particularly assiduous trial counsel, who is very likely to have noticed a possibility of confusion had it

[3]The defendant also complains that the judge gave the erroneous instruction equating malice with "anger, hatred and revenge" or a "selfish, wrongful motive." We had previously disapproved such instruction in *Commonwealth* v. *Eagles*, 419 Mass. 825, 834-837 (1995). The defense made no objection. It is the duty of the trial judges to inform themselves of recent decisions of this court and to incorporate them into their charges, as it is the duty of both the prosecution and the defense to inform the judge of these decisions. In this case the error created no likelihood at all of a miscarriage of justice, but once again time and effort would have been spared had counsel for both sides assisted the judge in avoiding this error.

existed, and the extremely emphatic language we quote above defining deliberate premeditation, we think there was virtually no risk that the jury, which rejected the extreme atrocity or cruelty charge, could have found that Diaz's killing of Fonseca was anything other than intentional. This conclusion is in accord with, and indeed follows, from our recent decision in *Commonwealth* v. *Gibson*, 424 Mass. 242, cert. denied, 117 S. Ct. 2518 (1997). In that case we concluded that "[i]n the face of the trial judge's [proper instructions on deliberate premeditation], the [constitutionally defective] inferred malice instruction could have had no impact because a reasonable juror could only have understood that a guilty verdict . . . by reason of deliberate premeditation required a finding of purposeful conduct that included a finding beyond a reasonable doubt of a specific intent to kill." *Id.* at 247. See *Commonwealth* v. *Waite,* 422 Mass. 792, 804 (1996). Also, in *Gibson*, unlike this case, the error was of constitutional dimensions.

III

We have reviewed the whole record under our obligation under G. L. c. 278, § 33E, and conclude that the conviction of murder in the first degree in all respects accords with substantial justice.

*Judgment affirmed.*