## COMMONWEALTH vs. TIMOTHY REAVES.

Bristol. November 9, 2000. - June 21, 2001.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Joint Enterprise. Evidence,* Joint enterprise. *Practice, Criminal,* Instructions to jury, Required finding, Jury and jurors, Capital case. *Homicide. Malice. Jury and Jurors.*

At a murder trial, the judge correctly admitted in evidence an out-of-court statement of a joint venturer, where the statement was made during the course of and in furtherance of a common criminal enterprise and where there was adequate evidence that the defendant and the declarant were engaged in the enterprise. [387-388]

At a murder trial, the judge's failure to instruct the jury on the prerequisites for using statements by an alleged joint venturer did not create a substantial likelihood of a miscarriage of justice, where there was overwhelming evidence of the defendant's involvement in a joint criminal enterprise, and where the admission of a statement by the alleged joint venturer did not harm the defendant. [388-389]

At the trial of a murder case, there was sufficient evidence, together with reasonable inferences therefrom, to persuade the jury beyond a reasonable doubt of the existence of deliberate premeditation, intent to kill, or joint venture, and to warrant the defendant's conviction of murder in the first degree. [389-393]

At the trial of an indictment for murder in the first degree by reason of deliberate premeditation, no substantial likelihood of a miscarriage of justice was created by the judge's instructions to the jury defining all three prongs of malice and failing to specify that only the first prong of malice was applicable, where the judge's correct instruction on deliberate premeditation and explanation to the jury on the theory of joint venture cured any problem stemming from the instructions on malice. [393-394]

A defendant at a criminal trial was not entitled to have a guilty verdict set aside and a new trial ordered on the basis of his claim that the judge had erred when he allowed the jury to resume deliberations after a poll found that the guilty verdict they had returned was not unanimous, where the verdict had already been recorded prior to the poll, and nothing in the judge's handling of the poll could have affected the validity of the verdict. [394-396]

INDICTMENT found and returned in the Superior Court Department on May 25, 1994.

The case was tried before *Richard J. Chin,* J.

*Stanley W. Norkunas* for the defendant.

*Sharon L. Sullivan-Puccini,* Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant, Timothy Reaves, was convicted of murder in the first degree for the drive-by shooting of fourteen year old Daniel Correia.[1] The jury specified that they convicted the defendant on a theory of joint venture.[2] On appeal, the defendant claims that the judge erred in (1) allowing the Commonwealth to introduce statements of a coventurer; (2) denying his motion for a required finding of not guilty; (3) failing to clarify that malice for purposes of deliberately premeditated murder was limited to first prong malice; and (4) allowing the jury to continue deliberating after a jury poll found the jury's original verdict was not unanimous. He also requests that we use our plenary power under G. L. c. 278, § 33E, to enter a finding of not guilty or to reduce the conviction to murder in the second degree. For the reasons set forth below, we affirm the conviction and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* Viewed in the light most favorable to the Commonwealth, the evidence was as follows. At around 3 P.M. on April 15, 1994, the defendant and three companions (Scott Rose, Richard Hazard, and Michael Coull) came to Magnet Park in New Bedford to buy drugs. They approached Joseph Correia (the brother of the victim), and Rose asked Correia if he had a "bundle of dope [heroin]." Correia said that he did. However, when the defendant pulled out some money to proceed with the transaction, Correia snatched the money from the defendant's hands and told him "there ain't no drugs around here, you got beat for your money."[3]

During this exchange, three of Correia's companions came

---

[1] The defendant was found not guilty on other indictments related to the same incident.

[2] Two codefendants (Scott Rose and Richard Hazard) were tried together at a separate trial and both convicted of murder in the second degree. *Commonwealth* v. *Rose,* 47 Mass. App. Ct. 168 (1999). A third codefendant (Michael Coull) pleaded guilty to manslaughter. *Id.* at 169.

[3] Various witnesses testified that there was an effort underway to try to keep the park free of drugs.

over, one of whom (Landon Arnum) was acquainted with the defendant. The defendant, apparently offended by Correia's treatment, told Arnum, "Tell this kid [Correia] who I am. I'm from the old school." Other witnesses recalled more remarks in a similar vein ("Stop trying to play me." "Tell them I'm not to be fucked with." "I ain't no joke"). One of Correia's friends then advised Correia to give the defendant his money back, observing that the defendant was probably unaware of the efforts to end drug selling in the park. Correia handed the money back.

This gesture did not mollify the defendant. He pulled out more money and said, "If you want to beat me, beat me right." The defendant then began arguing with another of Correia's companions, Shane Arnum. The argument ended abruptly when Shane Arnum punched the defendant in the jaw, knocking him unconscious. The money flew out of the defendant's hand, and was taken by the various onlookers.

Scott Rose then picked up the defendant, carried him to his car, and placed him in the back seat, still unconscious. Rose threatened, "We'll be back to spray it up." He was also heard asking the others, "Who got the strap [gun]?" Landon Arnum testified that he saw the defendant "coming through" as the four prepared to leave. As they left, the men in the car, including the defendant, repeated the threat, "We'll be back."

Two hours later, the defendant, Rose, Coull, and Hazard arrived at the home of Patricia Chaney and William Watson in Taunton, some twenty-five miles away from Magnet Park. Chaney was home, and told the men that Watson would be returning shortly. When Watson arrived, Rose met him in the driveway and said, "I need a favor." The defendant, whose face was still bloodied from the earlier blow, went to the bathroom to clean up. Rose and Watson proceeded into the parlor, at which point Rose told Watson, "I need one of your guns. All of my boys are packing and I don't have one." Rose also told Watson, "Don't dis me in front of my friends." Watson went to get the key to his gun cabinet. When Watson returned to the parlor, Hazard was there with Rose. Rose then explained to Watson that "one of his boys got in trouble in New Bedford

and he was going to straighten it out. Nobody does that to one of his boys."[4] Watson removed a shotgun and some shells from the gun cabinet and placed them on the couch. Hazard indicated that he was familiar with that type of gun and that he would know how to load and use it.

Patricia Chaney testified that the defendant and Coull soon joined the others in the parlor, and that all four men were in the parlor with William Watson for ten to fifteen minutes. At one point, Chaney went into the parlor to get her children.[5] Rose, Hazard, Coull, and the defendant were all there. The gun and shells were lying on the couch. A short while later, she saw the four men emerge from the parlor with the gun. They concealed the weapon in a plastic trash bag and left the house carrying the concealed shotgun.

Around 7 P.M that evening, the defendant, Rose, Coull, and Hazard returned to Magnet Park in Rose's car. Rose was driving. Hazard was in the front passenger seat with the shotgun. Coull was sitting behind the driver, and the defendant was sitting behind Hazard. The two in the front had bandanas pulled over their faces. The men in the back seat wore sunglasses and caps.

Many people were still outside in front of the housing development adjacent to the park, including Joseph Correia and the companions who had been with him during the confrontation earlier that afternoon. Correia was sitting on the hood of a parked car. His younger brother, Daniel Correia, was sitting on the trunk of the same car.

As Rose drove up the street toward Joseph Correia's group, gunshots rang out from the car. Two weapons were firing, one out the front driver's side window[6] and another out the rear

---

[4]Watson also recounted this statement in a version that had an even more explicit reference to the defendant's having been beaten in a fight: "These guys beat up my boy, and I'm going to go handle them. I'm going to take care of this, cause nobody beats up my boys like this."

[5]Chaney explained that she was afraid of Rose and wanted to keep her children away from him and his companions.

[6]Witnesses noticed that the driver was leaning way back in his seat. Hazard, from the front passenger seat, held the shotgun across Rose, pointing it out Rose's window.

driver's side window.[7] As Joseph Correia ducked behind the parked car, he was shot in the leg. Another shot hit Daniel Correia, who fell to the ground. Other shots were fired in the general direction of the housing development striking a car, a door, and windows as high as the third floor. Joseph and Daniel Correia were the only two people hit. Daniel died shortly thereafter of a single bullet wound through the heart.

. The car carrying the gunmen sped from the scene, but was followed by a man on a motorcycle. Specific information about the car, including its whereabouts and direction, were soon relayed to the police. As police cars came into view of Rose's vehicle, the driver in the car behind Rose saw a black object thrown out one of the passenger side windows. The witness later brought police back to the spot, where they retrieved a nine millimeter handgun. A ballistics expert opined that the bullet taken from Daniel Correia's body had been fired from that same handgun.

Rose led police on a chase with speeds in excess of one hundred miles an hour, breaking through a police roadblock in Taunton. The chase ended when Rose's vehicle crashed into another car. Hazard got out of the front passenger side and attempted to flee on foot. Rose was slumped over the steering wheel. Coull had been ejected part way out the rear driver's side window. The defendant was in the rear passenger seat, having suffered a spinal fracture.[8] As police came upon the accident scene immediately following the crash, an officer saw a shotgun thrown out a passenger side window. The shotgun was later identified as the one Rose had borrowed from William Watson earlier that evening.

2. *Statements of a joint venturer.* The defendant objected to

---

[7]One of the witnesses testified that he saw the defendant's hands jerking back and forth as the gun went off, suggesting that the defendant himself was firing the gun from the back seat. However, the jury specified that the defendant was guilty on a theory of joint venture. They were not convinced beyond a reasonable doubt that he was the actual shooter.

[8]The defendant was removed from the car by police and taken to the hospital. According to the police officer who saw him at the hospital, and according to the medical records, the defendant was still moving his arms at that time. He was unable to move his legs. The accident has rendered the defendant quadriplegic, with no use of his legs and limited use of the triceps and biceps muscles in his arms.

Watson's testimony concerning Rose's statement when they first entered the parlor ("I need one of your guns. All of my boys are packing and I don't have one"). The judge overruled the objection and admitted the evidence as a statement of a joint venturer made during the course and in furtherance of the joint venture. The admission of the statement was proper.

An out-of-court statement by a joint venturer is admissible against a defendant if "(a) a statement was made during the course of and in furtherance of a common criminal enterprise and (b) there is sufficient nonhearsay evidence to establish an adequate probability that the declarant and the defendant were engaged in the criminal enterprise." *Commonwealth* v. *Nascimento*, 421 Mass. 677, 680-681 (1996). Here, there was ample evidence that a common criminal enterprise existed and that this statement was made in furtherance of that enterprise. After the humiliation of the defendant earlier that afternoon and the threats by his cohorts to come back and "spray it up," the men arrived together at the Watson home, where they acquired one of the guns that was used two hours later to exact their revenge. All four were present when the shotgun and shells were on the couch, all four left with the shotgun, and all four were together in the car during the shooting. As the Appeals Court observed in affirming the convictions of Rose and Hazard, the facts of this case represent "the classic pattern of a joint criminal venture." *Commonwealth* v. *Rose*, 47 Mass. App. Ct. 168, 174 (1999). The evidence raises more than an "adequate probability" that Rose (the declarant) and the defendant were joined in a criminal enterprise. *Commonwealth* v. *Nascimento, supra* at 680. Rose's statement to Watson, made in order to acquire the shotgun, was obviously in furtherance of that enterprise. As such, Rose's statement was properly admitted.[9]

On appeal, the defendant also complains that the judge did not instruct the jury on the prerequisites for using statements by an alleged joint venturer. See *Commonwealth* v. *Fernandes*, 427 Mass. 90, 93 (1998); *Commonwealth* v. *Nascimento, supra* at 681 (when statement admitted as statement of joint venturer,

---

[9]The Appeals Court reached the same conclusion in Hazard's case, affirming the trial judge's decision to admit Rose's statement as evidence against Hazard. *Commonwealth* v. *Rose, supra* at 175.

jury should be instructed that they may not rely on statement unless they first find, based on nonhearsay evidence, that joint venture existed). At trial, the defendant did not object to the judge's failure to give that instruction. We therefore consider whether the omission of that instruction created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Pierce*, 419 Mass. 28, 38-39 (1994). It did not.

As discussed above, there was overwhelming evidence of the defendant's involvement in a joint criminal enterprise, and that enterprise was clearly underway by the time the four arrived at Watson's house. Indeed, the sole purpose of the trip to Watson's house was to acquire a weapon in order to "spray it up," as threatened two hours earlier. With the predicates for use of a joint venturer statement so clearly satisfied, the lack of an instruction on the subject is of no consequence.

Nor, ultimately, did the admission of the statement harm the defendant. To the extent that Rose's statement was offered for its truth, the defendant's concern was with the reference to "all my boys are packing." That portion of Rose's statement could suggest that the defendant himself already had a weapon, and the statement could thereby tie the defendant to the handgun that fired the fatal shot.[10] However, the jury rejected the Commonwealth's contention that the defendant was the one who shot Daniel Correia, and convicted him only on a theory of joint venture. Thus, the jury did not use Rose's statement in the manner the defendant feared. There was no substantial likelihood of a miscarriage of justice from the lack of an instruction on the prerequisites for use of joint venturer statements.

3. *Motion for required finding.* The defendant argues that he was entitled to a required finding of not guilty, as the evidence was insufficient to find deliberate premeditation, intent to kill, or joint venture. When reviewing a claim of insufficient evidence, "we determine whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom,

---

[10]Rose's statement to Watson that he "needed a gun" was never in dispute. The defendant's theory at trial was that the shooting spree was Rose's idea and Rose's doing, and that the defendant was merely present in the car when Rose carried out his plan. That Rose told Watson, outside the defendant's presence, that he needed a gun for a planned reprisal was thoroughly consistent with the theory of the defense.

when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged." *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979). There must be more than slight evidence to support each essential element, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), and a conviction may not "rest upon the piling of inference upon inference or conjecture and speculation." *Commonwealth* v. *Mandile*, 403 Mass. 93, 94 (1988), citing *Commonwealth* v. *Ferguson*, 384 Mass. 13, 18 (1981).

The defendant suggests that the nature of the drive-by shooting, with multiple shots being "sprayed" in different directions, does not support the conclusion that any of the participants acted with an intent to kill. We are unpersuaded by the argument. While some shots were fired at points higher on the building, at least two shots were fired at the precise group with whom the defendant had had the confrontation earlier that day. Joseph Correia (the person responsible for the initial humiliation of the defendant) was hit in the leg as he ducked down off the car on which he had been sitting. Daniel Correia, who had been sitting on the same car, was hit in the chest.[11] The shots that hit the two brothers were also fired at reasonably close range. (The car on which the brothers were sitting was parked on the street down which Rose drove.) That some additional shots were fired in the air in the general direction of the housing development — whether for good measure or to scare off witnesses[12] — does not detract from the apparently intentional close-range shooting of the Correia brothers. There was ample evidence to support the inference that the perpetrators intended to kill.

There was also abundant evidence of deliberate premeditation. Revenge for the defendant's having been knocked unconscious was plotted over a period of some hours. The determination to

[11]Daniel Correia had not been present during the afternoon's events, but was related to the prime instigator of the perceived affront and was sitting with the same group when the gunmen drove by that evening. The judge instructed the jury on the doctrine of transferred intent. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 345-346 (2001).

[12]Many other witnesses dived for cover and, as a result, were unable to make detailed observations of the shooters.

avenge the defendant's embarrassing defeat in the earlier confrontation, including the specific intention to do so with a firearm, was first announced as the group left the scene of that confrontation. Two hours later and twenty-five miles away, the group acquired a shotgun for the expressly stated purpose of avenging that earlier beating. Two hours after that, the same group arrived at the scene of the shooting, armed with yet another gun, their faces masked with bandanas. The jury had more than a sufficient basis on which to conclude that this fatal shooting was deliberately premeditated.

The defendant further contends that there was insufficient evidence to convict him on a theory of joint venture, arguing that there was no evidence of his participation in the crime and no evidence that he had the requisite mental state. In short, he contends that the Commonwealth proved nothing beyond his mere presence at the scene of the shooting.

For purposes of joint venture, a defendant's participation in the crime is shown if the defendant was, by agreement, "willing and available to help the [principal] if necessary." *Commonwealth* v. *Williams*, 422 Mass. 111, 121 (1996). The defendant (whose humiliation over being knocked out was the entire motivation for the later retaliatory shooting) was with the other three participants during the planning of the attack, throughout the attack itself, and during the subsequent chase. The jury could infer that the defendant was, at the very least, lending encouragement to his companions in their efforts to avenge his earlier defeat. The jury could also infer that he participated in the attempt to dispose of both guns used in the attack.[13]

There was also sufficient evidence from which the jury could

[13]The handgun, which had been fired from the back seat, was thrown out the passenger side of Rose's vehicle during the attempted escape. The defendant, seated in the rear passenger side seat, was the most likely person to have tossed the gun out the window. The evidence also suggested that, following the car crash, the defendant was the only one who could have thrown the shotgun from the car. When the officer saw the shotgun come out a window of the car, Hazard was already fleeing on foot, Coull had already been ejected out the rear driver's side window, and Rose was slumped over the steering wheel bleeding profusely. While the defendant argued that his injuries would have made it impossible for him to throw an object at that time, his own

infer that the defendant shared the intent to kill in retaliation for his earlier humiliation, and that he deliberately premeditated the killing. "[T]he jury may infer the requisite mental state [for a joint venturer] from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988), quoting *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). "The use of a firearm in the killing is sufficient to support a verdict of murder in the first degree based on deliberately premeditated malice aforethought." *Commonwealth* v. *Williams, supra* at 123, citing *Commonwealth* v. *Bourgeois*, 404 Mass. 61, 63-64 (1989). "[E]vidence that the defendant brought a gun with him to the scene of a planned crime is evidence of planning, which included preparation for using the gun." *Commonwealth* v. *Stewart*, 398 Mass. 535, 541 (1986).

Here, the evidence established the defendant's presence at and awareness of Rose's acquisition of a gun for the stated purpose of a retaliatory shooting. While Rose's initial request for the gun was made outside the defendant's hearing, the evidence showed that the defendant was with Rose, Hazard, and Coull for some ten to fifteen minutes with the shotgun in plain sight on the couch. The jury could infer that the general subject matter of Rose's need for the gun (which was the entire purpose of his twenty-five mile trip to Watson's home) continued to be discussed as his other companions joined him in Watson's living room.[14] The defendant was also aware that Rose took the gun with him. The jury thus had ample evidence of the defendant's involvement in the planning of the shooting.

The defendant's argument on this point also ignores the fact that the defendant himself was the very purpose of this retaliatory venture. The jury could reasonably infer that the defendant's three companions, who had been with him when he was knocked out, with him at Watson's house, and with him

medical records confirmed that, in the immediate aftermath of the crash, he was still able to move his arms.

[14]Rose's request that Watson give him the gun and not "dis [him] in front of [his] friends" also suggests that Rose had already told his "friends" that Watson would supply him with a gun. Rose feared that he would lose face if Watson then refused to lend him the gun.

throughout the shooting itself, would include him in their vengeful plan to shoot the people who had offended him earlier that afternoon. The defendant himself had exhibited outrage when his attempt to buy drugs was rebuffed and his money snatched. The defendant's indignation at being knocked unconscious with a single blow would, when he regained consciousness, surely be even greater. There was evidence that the defendant was regaining consciousness, and would thus have overheard the initial threats made by his companions as they left the scene of the original confrontation, and that the defendant himself joined them in announcing, "We'll be back." Such evidence of prior hostility supports an inference of malice. See *Commonwealth* v. *Pucillo*, 427 Mass. 108, 112-113 (1998), and cases cited. The jury could thus infer that the defendant had the requisite mental state for deliberately premeditated murder with malice aforethought.

4. *Instructions on malice.* The defendant claims that the judge erroneously instructed the jury when he defined all three prongs of malice[15] and failed to clarify that, for murder in the first degree committed with deliberate premeditation, only the first prong of malice was applicable.[16] See *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998); *Commonwealth* v. *Diaz*, 426 Mass. 548, 553 (1998). Because there was no objection, we review this claim of error to determine whether there was a substantial likelihood of a miscarriage of justice. Here, as in *Commonwealth* v. *Jenks*, *supra*, and *Commonwealth* v. *Diaz*, *supra* at 552-554, the judge's correct instruction on deliberate premeditation suffices to avoid any substantial likelihood of a miscarriage of justice. The judge explained that, in order to prove deliberate

[15]Although the judge initially instructed on all three prongs of malice, he later defined malice with reference only to "an unexcused intent to kill or an unexcused intent to do an act creating a plain and strong likelihood that death would follow," eliminating any reference to second prong malice (intent to cause grievous bodily harm).

[16]The defendant also claims error in the instruction that malice may be inferred from the intentional use of a dangerous weapon. The instruction was correct. See *Commonwealth* v. *Roderick*, 429 Mass. 271, 277 (1999). The Model Jury Instructions on Homicide include that instruction, and reference it as an appropriate supplemental instruction on first prong malice as part of the instruction on murder in the first degree with deliberate premeditation. Model Jury Instructions on Homicide at 8, 61 (1999).

premeditation, the Commonwealth had to prove that "the defendant formed a plan to murder after deliberation," that the defendant made a "decision to kill" followed by a "killing [in] furtherance of the decision," and that "the defendant's resolution to kill was the product of cool reflection." This version of the deliberate premeditation instruction "required a finding of purposeful conduct that included a finding beyond a reasonable doubt of a specific intent to kill," a finding that inherently satisfies first prong malice. *Id.* at 554, quoting *Commonwealth* v. *Gibson*, 424 Mass. 242, 247, cert. denied, 521 U.S. 1123 (1997). Thus, the failure to specify that only the first prong malice is applicable to murder in the first degree with deliberate premeditation does not give rise to any substantial likelihood of a miscarriage of justice.

The defendant further argues, however, that the deliberate premeditation instruction does not cure the confusion because the defendant was convicted solely on a theory of joint venture. The defendant posits that, even if the jury found that the principal had the requisite intent to kill, the jury's conclusion that the defendant shared the requisite mental state of malice might have been based on the defendant's having only an intent "to do an act with a plain and strong likelihood that death would follow." However, that theoretical possibility was eliminated by the judge's response to a question from the jury. The jury asked the judge to repeat his instructions on murder in the first degree by means of deliberate premeditation and his instructions on joint venture. The judge specified that, to convict on a theory of joint venture, the Commonwealth had to prove all of the elements of joint venture "[i]n addition to the elements that are required for murder in the first degree with deliberate premeditation." With specific reference to the requirement that a joint venturer share the mental state for the crime, the judge stated that "the defendant's charged with murder in the first degree with deliberate premeditation and must share that intent." The jury thus understood that the defendant himself had to have engaged in "deliberate premeditation," a requirement that would cure any problem stemming from the instructions on malice.

5. *Jury poll.* The defendant claims that the judge erred when

he allowed the jury to resume deliberations after a poll found that the guilty verdict they had returned was not unanimous. There was no error.

The sequence of events surrounding the taking of the verdicts was as follows. The jury returned with their verdicts, and the foreperson affirmed that all members of the jury agreed upon those verdicts. The judge examined the verdict slips. The verdicts were then announced by the foreperson. She announced that the jury found the defendant guilty of murder in the first degree, specifying that the jury found the defendant guilty as a joint venturer. On all other indictments, the foreperson announced verdicts of not guilty. The clerk then retrieved the verdict slips and asked the judge if the verdicts could be recorded. The judge responded, "Yes." The clerk then proceeded to record the verdicts, asking the members of the jury to "harken to your verdicts as the Court will now record them," repeating the previously announced verdicts, and asking, "So say you, Madam Forelady, so say all of the deliberating jurors?" The jurors responded, "Yes."

Defense counsel then asked that the jury be polled "as to the murder indictment." At that point, the verdict had already been recorded, and the judge should not have polled the jury. *Commonwealth* v. *Hardy*, 431 Mass. 387, 399 (2000). See Mass. R. Crim. P. 27 (d), 378 Mass. 897 (1979) ("When a verdict is returned and before the verdict is recorded, the jury may be polled in the discretion of the judge"). Any request to poll the jury must be made before the verdict is recorded, and judges should not allow untimely requests for polling.[17] Here, the judge allowed counsel's untimely request, and the clerk proceeded to poll the jury. Eleven of the jurors responded that they agreed with the verdict, but one juror responded that he did not agree.

Following the poll, the defendant moved that the verdict be set aside and that a verdict of not guilty be directed, or, in the alternative, for a mistrial. The judge denied the motion. Over

[17]The jury may be polled after the verdict is recorded if one or more jurors has expressed a "public disagreement" with the verdict as the verdict is being taken or recorded. See *Commonwealth* v. *Hardy*, 431 Mass. 387, 399 (2000); *Commonwealth* v. *Dias*, 419 Mass. 698, 703 (1995); *Commonwealth* v. *Nettis*, 418 Mass. 715, 718-719 (1994). There is no evidence of any "public disagreement" being expressed during the taking and recording of this verdict.

the defendant's objection, the judge ordered the jury to resume deliberations. Forty-five minutes later, the jury returned with a verdict of guilty of murder in the first degree, again specifying that the jury found the defendant liable as a joint venturer. The jury were polled prior to the recording of that verdict, and all jurors confirmed their agreement with that verdict.

The defendant contends that the judge's only options in response to the first poll were to declare a mistrial, have the jury determine whether to resume deliberations, or replace the dissenting juror with an alternate juror and have that jury commence deliberations. He therefore argues that he is entitled to have the verdict set aside and a new trial ordered. We disagree. As discussed above, the verdict had already been recorded prior to the poll, and nothing in the judge's handling of the poll would affect the validity of the original verdict. "When a verdict is received and recorded, and the jurors indicate their concurrence by affirming the verdict in open court, neither a juror's change of heart nor a juror's subsequent disclosure of a subjective disagreement with her apparent vote provides a basis for vacating the verdict." *Commonwealth* v. *Dias*, 419 Mass. 698, 703 (1995). See *Commonwealth* v. *Martell*, 407 Mass. 288 (1990) (disagreement expressed by juror after verdict had been recorded did not affect validity of verdict or require judge to order new trial).[18]

6. *Section 33E review.* After reviewing the entire case pursuant to G. L. c. 278, § 33E, we conclude that the interests of

---

[18]Had the poll been conducted prior to recording the verdict, there would also be no error in the judge's decision to have the jury resume deliberations. "If after the poll there is not a unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged." Mass. R. Crim. P. 27 (d), 378 Mass. 897 (1979). See *Commonwealth* v. *Hebert*, 379 Mass. 752, 756 (1980). The defendant contends that, before a polled jury resumes deliberations, the judge should have the jurors themselves agree to that resumption of deliberations. See *Commonwealth* v. *Nettis*, 418 Mass. 715, 716-717 (1994) (mistrial declared after polled jurors unable to agree unanimously to continue deliberations). A judge does not need the jury's agreement to resume deliberations. Nothing in rule 27 (d) makes such a step mandatory. In *Commonwealth* v. *Nettis*, *supra*, we upheld the declaration of a mistrial when a poll revealed that the verdict was not unanimous, a course of action expressly allowed by rule 27 (d). We did not address either the need for or the propriety of the judge's obtaining the jurors' views about their willingness to resume deliberations.

justice do not require a new trial or the entry of a lesser degree of guilt as to the murder conviction. That the defendant himself suffered grievous and permanent injuries in the course of his attempted flight from the murder scene does not warrant any reduction in the degree of guilt.

*Judgment affirmed.*