SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. DEWANE M. TSE.

 
 Docket:
 SJC-13344
 
 
 Dates:
 September 11, 2024 - November 20, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Homicide. Armed Assault with Intent to Murder. Joint Enterprise. Evidence, Joint venturer, Intent, Inference, Videotape. Intent. Practice, Criminal, Required finding, Capital case.
 
 

             Indictments found and returned in the Superior Court Department on June 26, 2019.
            The cases were tried before Anthony M. Campo, J.
            Robert L. Sheketoff for the defendant.
            Molly Paris, Assistant District Attorney, for the Commonwealth.
            KAFKER, J.  Approximately one-quarter of an hour before ten in the morning on August 14, 2018, Yashua Amado, Darrell Smith, and Jerome Smith[1] were shot on Deering Road in Mattapan as they sat in Amado's car.  Amado was killed, and Darrell and Jerome suffered non-life-threatening gunshot injuries.  The shooter has never been identified.
            The defendant, Dewane M. Tse, was indicted on one charge of murder in the first degree and two charges of armed assault with intent to murder.  The Commonwealth alleged that the defendant knowingly participated in a joint venture with the shooter by following the victims prior to the shooting and driving the shooter to and from the crime scene.  A jury convicted the defendant of murder in the first degree based on deliberate premeditation as to Amado and armed assault with intent to murder as to Darrell.  The defendant moved for required findings of not guilty both after the Commonwealth's case-in-chief and at the close of all of the evidence, and before sentencing moved to set aside the guilty verdicts.  The trial judge denied these motions and sentenced the defendant to life in prison without the possibility of parole on the murder conviction and a concurrent term of from ten years to ten years and one day in prison on the armed assault with intent to murder conviction.
            On appeal, the defendant argues that the trial judge erred in denying his motions for required findings of not guilty because there was insufficient evidence to prove beyond a reasonable doubt that the defendant knowingly participated in the shooting and knew of and shared the shooter's lethal intent as a joint venturer.  Because we agree that there was insufficient evidence to prove beyond a reasonable doubt that the defendant knew of or shared his alleged coventurer's intent, we reverse the defendant's convictions of murder in the first degree and armed assault with intent to murder.
            1.  Background.  a.  Facts.  We review the evidence in the light most favorable to the Commonwealth and reserve certain facts for our discussion of the legal issues.  See Commonwealth v. Witkowski, 487 Mass. 675, 676 (2021); Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).
            i.  The shooting.  On the day of the shooting, at approximately 9:46 or 9:48 A.M., two Boston police officers heard several gunshots while standing outside their cruiser at the Area B3 police station on the corner of Blue Hill Avenue and Morton Street in the Mattapan section of Boston.[2]  With their cruiser's lights and sirens activated, the two officers drove across Morton Street, proceeded up Wellington Hill Street, and turned onto Deering Road after observing two men in the street.[3]  While driving east on Deering Road toward Blue Hill Avenue, the officers encountered the two men, later identified as Jerome and Darrell, and observed that each appeared to have suffered gunshot wounds.  Jerome and Darrell directed the officers westward back up Deering Road, where they believed another person had been shot inside of a red vehicle.
            One officer ran up the street and discovered a red Lexus sedan (Lexus) in front of 40 Deering Road.  The officer observed multiple bullet holes in the windshield and driver's side window of the Lexus.  Inside, a third victim, later identified as Amado, sat in the driver's seat.  Amado had been shot in the torso and right shoulder.  The officers attempted to resuscitate Amado, but emergency medical personnel determined that he was "not viable" shortly thereafter.  Amado succumbed to his injuries.
            Just prior to the shooting, an eyewitness observed a Black man, walking east on Deering Road from the direction of Wellington Hill Street, approach the driver's side door of the Lexus.  The eyewitness saw the man, who was wearing a black hooded sweatshirt, raise his right hand and heard several gunshots.  The unknown shooter then turned around and ran west back up Deering Road toward Wellington Hill Street, out of the eyewitness's view.
            The appearance of the shooter on video footage did not match that of the defendant.  At trial, a Boston police detective testified that, based on his review of video evidence discussed infra, the shooter was "not obese."[4]  In contrast, the defendant was characterized as having a "different" body type.  At the time of his arrest in April 2019, the defendant weighed "about 317" pounds, with a height of five feet, eight inches.  The defendant was described by the detective as appearing like he was "carrying a ten-month baby high [in] his belly."
            ii.  The investigation.  Boston police detectives reviewed video footage from various security cameras in the vicinity of Blue Hill Avenue on the day of the shooting.[5]  In the course of this review, investigators noticed a red GMC Acadia (Acadia) that appeared to be following Amado's Lexus.  None of the footage, however, depicted anybody entering or exiting the vehicle, and neither the driver nor any passengers could be seen inside it.
            The collected footage depicted the Acadia and the Lexus maneuvering on and around Blue Hill Avenue from approximately 9:22 A.M. until approximately 9:41 A.M -- roughly four minutes before the shooting.  At 9:30:54 A.M., Amado and Darrell exited a restaurant on Blue Hill Avenue, with the Acadia passing by them on the opposite side of the street at the same moment.  At 9:34:35 A.M., the Acadia turned into a gasoline station parking lot and pulled into an area facing Blue Hill Avenue.  Shortly thereafter, at 9:35:18 A.M., the Acadia neared the lot's exit and, after the Lexus went past, proceeded onto Blue Hill Avenue in the same direction as the Lexus.  The Acadia then accelerated, stopped suddenly to avoid hitting the vehicle in front of it, and switched lanes, continuing northbound in the same direction as the Lexus.
            The Lexus made a U-turn at the intersection of Blue Hill Avenue and Morton Street at approximately 9:38:40 A.M., passing the Acadia as it approached the same intersection on the other side of the median.  The Lexus then proceeded southbound on Blue Hill Avenue and turned right onto Deering Road at 9:38:52 A.M.  At 9:39:40 A.M., the Acadia went through the intersection of Blue Hill Avenue and Morton Street, made a U-turn at the next intersection, and continued southbound on Blue Hill Avenue.  At 9:41:24 A.M., the Acadia turned right from Blue Hill Avenue onto Deering Road and, at approximately 9:42 A.M., proceeded west past 56 Deering Road toward Wellington Hill Street.[6]  The shooting was not captured on video, but the unidentified shooter was recorded walking east past 56 Deering Road toward Blue Hill Avenue at approximately 9:45 A.M. and sprinting west back past 56 Deering Road toward Wellington Hill Street at approximately 9:46 A.M.
            Using the footage, investigators determined several characters on the Acadia's license plate and traced the vehicle back to Maven, a now-defunct car sharing and rental business operated by General Motors.  To make a rental reservation for a Maven vehicle, customers first had to create an account and submit their name, contact information, driver's license information, and credit card information to Maven for approval.  Once approved, customers, also referred to as members, could then use the Maven cell phone application to rent vehicles held by Maven in various parking garages and public parking lots.  Each reservation was tied to a member's cell phone number, such that the cell phone associated with the member's account acted as the key for the rented vehicle.  A member could therefore only start a reservation, turn the vehicle on initially and after the vehicle was turned off at other points during the reservation, or end a reservation if the member's cell phone was physically close enough to the vehicle to connect to it via a short-range wireless Bluetooth connection.  Each Maven vehicle was equipped with General Motors's "OnStar" technology, which collected data about the vehicle's location, fuel level, tire pressure, and odometer during each reservation.
            Records produced by Maven identified the defendant as the holder of the Maven account through which the Acadia was reserved from 2:30 P.M. on August 12, 2018, to 2:30 P.M. on August 14, 2018.  The account information included the defendant's name, cell phone number, e-mail address, and mailing address; this information had been verified by Maven using the defendant's driver's license and credit card.  Maven's records also included global positioning system (GPS) location data for the Acadia throughout the reservation, with the data logged at roughly thirty-second intervals whenever the vehicle's ignition was on.[7]
            The Boston police department provided both the Maven GPS location data and the cell site location information (CSLI) generated by the cell phone associated with the defendant's cell phone number to the Federal Bureau of Investigation (FBI) for mapping and location analysis.  The FBI's analysis determined that the Acadia was present on Blue Hill Avenue as early as 7:00:02 A.M on August 14, 2018.  The GPS location data placed the Acadia near the aforementioned restaurant, which Amado and Darrell had entered, on Blue Hill Avenue between 9:34:23 A.M. and 9:35:57 A.M., near the intersection of Blue Hill Avenue and Morton Street between 9:40:35 A.M. and 9:41:06 A.M., and on Deering Road approaching the intersection with Wellington Hill Street between 9:42:00 A.M. and 9:42:08 A.M.
            From 9:43:31 A.M. to 9:46:32 A.M., the Acadia was stationary outside of 85 Deering Road, west of the Wellington Hill Street intersection.  The Acadia's next GPS location was logged at 10:11:07 A.M., at which point the Acadia was traveling away from the area of the aforementioned restaurant and toward Milton.  The Acadia continued until it ultimately entered the area of Haymarket Square in Boston at 10:37:28 A.M. and ended its travel at approximately 10:42 A.M.
            The FBI's analysis of the CSLI associated with the defendant's cell phone number placed the cell phone on and around Blue Hill Avenue several times between 7:08:46 A.M. and 9:33:01 A.M. on August 14, 2018.  No CSLI associated with the cell phone was generated again until 10:11:50 A.M., at which point the cell phone was moving northbound in the vicinity of Interstate 93.  Subsequent CSLI placed the cell phone in Haymarket Square at 10:43:52 A.M.
            Boston police investigators also reviewed video footage from the Government Center Garage in Haymarket Square, which housed the designated parking spot where Maven members could pick up and drop off the Acadia.  On August 12, 2018, security cameras captured an individual resembling the defendant exit a gray sedan outside of the Government Center Garage at 2:16 P.M. and enter the garage at 2:20 P.M.  On August 14, 2018, security cameras captured the Acadia enter the Government Center Garage at 10:40 A.M. and an individual resembling the defendant exit the garage shortly thereafter.  At 10:49 A.M., an individual resembling the defendant was recorded walking outside near the garage's front entrance.
            On December 10, 2018, two Boston police detectives spoke with the defendant at his residence in Providence, Rhode Island.  During this conversation, the defendant stated that he had rented blue and red GMC Acadias from Maven in the past.  On April 29, 2019, the defendant was arrested and interviewed at Boston police headquarters, but he did not make any statements regarding the shooting.  The defendant was photographed at that time.[8]
            b.  Procedural history.  On June 26, 2019, the defendant was indicted on one count of murder in the first degree as to Amado, in violation of G. L. c. 265, § 1, and two counts of armed assault with intent to murder as to Jerome and Darrell, in violation of G. L. c. 265, § 18 (b).  The Commonwealth pursued the charge of murder in the first degree under the theory of deliberate premeditation, with the defendant purportedly engaged in a joint venture with the unknown shooter.  The Commonwealth specifically alleged that the defendant was the driver of the Acadia and brought the unidentified shooter to and from the scene of the shooting on August 14, 2018.
            The case proceeded to a jury trial on November 29, 2021, during which the defendant moved for a required finding of not guilty at the close of the Commonwealth's case-in-chief and renewed his motion at the close of the evidence.  The trial judge denied both motions.  On December 16, 2021, the jury convicted the defendant of murder in the first degree under the theory of deliberate premeditation as to Amado and of armed assault with intent to murder as to Darrell.  The jury acquitted the defendant of armed assault with intent to murder as to Jerome.  The defendant was sentenced on January 12, 2022, and filed a notice of appeal that day.
            On January 4, 2022, prior to his sentencing, the defendant moved for required findings of not guilty notwithstanding the verdicts pursuant to Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995).  The Commonwealth filed its opposition on January 24, 2022.  After a hearing, the trial judge issued a memorandum and order denying the defendant's motion on February 18, 2022.
            2.  Discussion.  In reviewing the defendant's claims of insufficient evidence for his convictions of murder in the first degree and armed assault with intent to murder as a joint venturer, "we assess the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt."  Commonwealth v. Robinson, 493 Mass. 303, 307 (2024), citing Latimore, 378 Mass. at 677-678.  "A conviction may rest exclusively on circumstantial evidence, and, in evaluating that evidence, we draw all reasonable inferences in favor of the Commonwealth."  Commonwealth v. Bonner, 489 Mass. 268, 275 (2022), quoting Commonwealth v. Javier, 481 Mass. 268, 279 (2019).
            a.  Murder in the first degree.  To prove the defendant guilty of murder in the first degree under the theory of deliberate premeditation as a joint venturer, the Commonwealth was required to "prove beyond a reasonable doubt that 'the defendant knowingly participated in the commission of the crime charged, and that the defendant had or shared the required criminal intent.'"  Commonwealth v. Watson, 487 Mass. 156, 162 (2021), quoting Commonwealth v. Britt, 465 Mass. 87, 100-101 (2013).  Particular to the circumstances of this case, "this required a showing that the defendant was the driver of the suspect vehicle, that [he] knew [his] passenger[] intended to kill the victim, and that [he] shared this intent."  Commonwealth v. Baez, 494 Mass. 396, 400 (2024), quoting Baxter v. Commonwealth, 489 Mass. 504, 508 (2022).
            We assume, without deciding, that the defendant was the driver of the suspect vehicle.  We conclude, however, that there was insufficient evidence to establish that the defendant knew the shooter, his alleged passenger, intended to kill Amado and that the defendant shared this intent.
            The Commonwealth contends that the way in which the defendant maneuvered the Acadia before and after the shooting is sufficient evidence that the defendant knew of and shared the unidentified shooter's lethal intent.  Because this conclusion rests on a chain of speculative assertions, we disagree.  See Baez, 494 Mass. at 401-402; Baxter, 489 Mass. at 510; Commonwealth v. Mandile, 403 Mass. 93, 94 (1988).  Our decision here is controlled by a line of cases in which essentially the same argument was raised and rejected, including most recently in Baez, supra at 404-405, and Baxter, supra at 509.  See Commonwealth v. Gonzalez, 475 Mass. 396, 414 (2016) (circumstantial evidence showing defendant's presence when murder was committed, even when "supplemented by evidence" that defendant knew about crime in advance, insufficient to support jury finding beyond reasonable doubt that defendant knew of and shared perpetrators' lethal intent); Mandile, supra at 101 (inference of defendant's knowledge and shared lethal intent "impermissibly remote" where evidence sufficient "to prove only prior association and presence outside the scene of the murder").
            Here, as in Baez and Baxter, the Commonwealth did not present direct evidence of the defendant's lethal intent or evidence that, at any point, the defendant was a witness to, or participant in, the shooting.[9]  See Baez, 494 Mass. at 403-404; Baxter, 489 Mass. at 510-511.  Compare Bonner, 489 Mass. at 271-272, 279 (shared lethal intent evident from defendant's presence and actions on scene during portion of shooting, including kicking and yelling insults at prone victim); Commonwealth v. Woods, 466 Mass. 707, 709, 713-714, cert. denied, 573 U.S. 937 (2014), S.C., 480 Mass. 231, cert. denied, 586 U.S. 1054 (2018) (four prior threats by defendant, who was not shooter, to kill or shoot victim sufficient as evidence of shared lethal intent).  Also, as in those two recent cases, the Commonwealth did not offer other evidence as to interactions or communications between the shooter and the defendant from which an inference of knowledge or shared lethal intent could be drawn, including any evidence as to whether the defendant knew that his purported passenger was armed.  See Baez, supra at 403; Baxter, supra.  Compare Commonwealth v. Sosa, 493 Mass. 104, 116-118 (2023), cert. denied, U.S. Supreme Ct. No. 24-5111 (Oct. 7, 2024) (evidence sufficient where defendant provided coventurer with gun and ammunition, stood by coventurer in minutes leading up to shooting, rifled through victim's pockets at coventurer's instruction, and observed coventurer point gun at victim's girlfriend before pointing it at victim); Commonwealth v. Reaves, 434 Mass. 383, 387, 391-393 (2001) (defendant was with his coventurers during shooting's planning and execution, observed coventurers' guns, and was present during attempt to dispose of weapons used in shooting).
            The Commonwealth instead relies heavily on the assertion that a rational jury could have reasonably inferred the defendant's knowledge and lethal intent because the defendant, based on the GPS location data, CSLI, and video footage offered at trial, "stalked" and "actively pursu[ed]" Amado in the approximately thirteen-minute period leading up to the shooting.  In Baez, 494 Mass. at 405, and Baxter, 489 Mass. at 510-511, we rejected similar arguments based on the manner in which the suspect automobile was maneuvered.
            In Baxter, 489 Mass. at 506,
"video footage showed the victim leaving an apartment building on Howard Avenue at 9:06 A.M., crossing the street, and walking down Wayland Street.  The [car driven by the defendant] followed him down Wayland Street, and then went past him and stopped along the curb on the side of the street where he was walking.  The car waited about eighteen seconds while the victim walked toward it on the sidewalk.  As the victim approached the car, it pulled away from the curb and traveled a short distance on Wayland Street before taking a right turn onto Balfour Street."
Less than one minute later, "as the victim walked past Balfour Street, a man in a red jacket came from Balfour Street on foot and quickly approached the victim from behind, extend[ed] his arms in front of him," and shot the victim.  Id.  The shooter was then seen entering the car driven by the defendant.  Id. at 506-507.  We concluded:
"[W]hile the evidence of the defendant's maneuvering of the vehicle may have allowed the jury to infer that the defendant knew of and shared the passenger's intent to assault the victim, it fails to sustain a reasonable inference, beyond a reasonable doubt, that he shared the passenger's intent that the attack be deadly, as required for a conviction under a joint venture theory."
Id. at 510.  The same is true here.
            In Baez, 494 Mass. at 404-405, we reached the same conclusion.  Witnesses in Baez observed that the defendant's borrowed Acura was initially driven slowly up Salem Street, the street on which the shooters would shortly thereafter enter that car.  Id. at 398-399.  As the defendant drove up Salem Street, he began to make a left turn onto High Street but then reversed back onto Salem Street, striking a parked car.  Id. at 398.  Instead of stopping, the defendant continued down Salem Street, allowed the shooters to enter the backseat as they ran from the scene of the murder, and drove away.  Id. at 398-399.  We again declined to accept that such maneuvering, without more, was sufficient to establish beyond a reasonable doubt the knowledge and shared lethal intent required to convict the defendant of murder in the first degree.  To conclude otherwise would have necessitated the "inference, on the basis of the car's maneuvers alone, that before hearing the gunfire, the defendant knew his coventurers were in possession of firearms, that they intended to use those firearms in a deadly attack, and that the defendant shared their intent."  Id. at 404.  See Gonzalez, 475 Mass. at 414-415 (evidence insufficient to establish that driver shared perpetrators' lethal intent even though perpetrators "carried out the shooting immediately after leaving the suspect vehicle," and driver, after dropping them off, maneuvered vehicle in certain way so that perpetrators could be retrieved after shooting); Mandile, 403 Mass. at 100-101 (insufficient evidence of shared lethal intent where defendant drove shooter to and from victim's home, knew shooter was armed when shooter entered home, and attempted to conceal crime, but remained outside of home during shooting).
            The Commonwealth's attempt to distinguish this case from Baxter and, by implication, Baez, based on the length of time the defendant's vehicle tracked the victims and the purportedly strategic nature of the vehicle's movements, is unpersuasive.  The necessary leap between the defendant's inferred intent to cause harm and the defendant's inferred intent to cause lethal harm cannot, without more, be supported by the evidence offered by the Commonwealth.  See Baez, 494 Mass. at 405; Baxter, 489 Mass. at 510.
            In sum, the evidence in this case did not support a reasonable inference, beyond a reasonable doubt, that the defendant acted with the knowledge and shared lethal intent required for a conviction of murder in the first degree under the theory of deliberate premeditation as a joint venturer.  Accordingly, the defendant's conviction must be reversed.
            b.  Armed assault with intent to murder.  We now turn to the defendant's conviction of armed assault with intent to murder as to Darrell.  Such a conviction "requires proof of assault . . . while armed with a dangerous weapon . . . and a specific intent to kill that equates with malice."  Commonwealth v. Vick, 454 Mass. 418, 428 (2009), citing G. L. c. 265, § 18 (b).  "Malice necessarily exists when specific intent to kill is proved and there is no evidence of justification, excuse, or mitigation."  Vick, supra, quoting Commonwealth v. Johnston, 446 Mass. 555, 558 (2006).  For the same reasons that the conviction of murder in the first degree was not supported by sufficient evidence of the defendant's knowledge and shared lethal intent, see discussion supra, we also conclude that there was insufficient evidence to support the defendant's conviction of armed assault with intent to murder.  See Baez, 494 Mass. at 405 n.5 (defendant's conviction of armed assault with intent to murder reversed based on insufficient evidence of lethal intent, where his conviction of murder in first degree arising from same shooting was also reversed based on insufficient evidence of shared lethal intent).  As such, the defendant's conviction of armed assault with intent to murder must also be reversed.
            3.  Conclusion.  Accordingly, we conclude that the evidence against the defendant was legally insufficient to support his convictions of murder in the first degree and armed assault with intent to murder.  We therefore reverse those judgments, set aside the verdicts, and remand the case to the Superior Court for entry of required findings of not guilty.
            So ordered.
 
footnotes

 
            [1] Because they share a surname, we will refer to Darrell and Jerome Smith by their first names.
            [2] A "ShotSpotter" system, which "identifies firearm discharges by sound and directs officers to the general location of the shots," Commonwealth v. Cuffee, 492 Mass. 25, 27 n.2 (2023), detected five gunshots on Deering Road between 9:46:04 A.M. and 9:46:06 A.M.  At trial, one of the responding officers testified that he heard the gunshots at "[a]pproximately 9:48 A.M., something along those lines."
            [3] Wellington Hill Street is a one-way street that intersects with Deering Road at the top of a hill.  The responding officers drove the wrong way up Wellington Hill Street while responding to the gunshots.  When the officers were stopped on the top of the hill at the intersection, they looked down Deering Road and noticed the two men.
            [4] The eyewitness to the shooting described the shooter as a Black man of "medium height . . . [f]ive ten or [six] feet[,] somewhere in that area."  When asked if the shooter's body type was "thin" or "fat," the eyewitness testified that it was "[h]ard to say."
            [5] Specifically, the footage was extracted from a gasoline station, a liquor store, private residences on Deering Road, Massachusetts Bay Transportation Authority buses, and Boston Regional Intelligence Center cameras.
            [6] A police detective testified at trial that the time stamp on video footage captured by a camera at 56 Deering Road was "two minutes slow from real time."
            [7] In response to the Commonwealth's subpoena, Maven initially produced GPS location data for the wrong vehicle.  After being contacted by the Commonwealth, Maven recognized the error and produced a second set of GPS location data that corresponded to the correct vehicle.  At trial, both sets of data were introduced in evidence, with the defendant suggesting that the second set of GPS data was unreliable given Maven's initial error and the overlap of some location coordinates in both the first and second data sets.  Reviewing the evidence in the light most favorable to the Commonwealth, as we must, see Witkowski, 487 Mass. at 676, we view the second data set as a record on which the jury could choose to rely for the Acadia's GPS location.
            [8] One of the detectives who arrested the defendant testified that the defendant's appearance in April 2019 was "[e]ssentially identical" to his appearance on December 10, 2018.
            [9] We do not suggest that direct evidence was required; indeed, knowledge and intent "are rarely proved by direct evidence and are most often proved circumstantially" (citation omitted).  Commonwealth v. Rosario, 83 Mass. App. Ct. 640, 643 (2013).